March 13,
  1906.

## OPINION OF THE JUSTICES.

The racing of horses is a game, and any form of betting thereon is gambling within the meaning of section 6, chapter 270, Public Statutes.

The charter of the New England Breeders' Club (Laws 1905, c. 232) does not empower the corporation to promote or permit upon its grounds book-making, pool-selling, or other form of betting or gambling on the races and contests of speed, skill, and endurance which it is authorized to conduct.

*To the Supreme Court :*

The governor and honorable council, being convinced that certain persons intend to maintain a race-track and to conduct races thereon in this state, in order to induce others to resort thereto for the purpose of engaging in pool-selling, book-making, and other forms of race-track gambling, and believing that unless such proceedings are already forbidden by law it will be our duty to call a special session of the legislature at once to act on the subject, respectfully require the opinions of the justices upon the following questions, so that the governor and council may correctly determine their duty in the premises.

(1) Whether the corporation created by chapter 232 of the Laws of 1905, under the name of the New England Breeders' Club, is empowered to keep, or let, any house, shop, or place resorted to for the purpose of pool-selling, book-making, or any form of betting or gambling upon the result of such races and contests of speed, skill, and endurance as it is by said chapter authorized to conduct; or to suffer any person to sell pools, make books, or in any other way bet or gamble upon the result of such races and contests, in any house, shop, or place under its care or control.

(2) Whether any such action, if not authorized, is forbidden by law.

JOHN McLANE, *Governor.*

F. S. TOWLE,
CHARLES M. FLOYD,
JOSEPH W. HOWARD,        } *Councilors.*
EDWARD G. LEACH,
C. H. GREENLEAF,

*To His Excellency the Governor, and the Honorable Council:*

The facts as to the existing situation, communicated to us under date of February 22, 1906, in connection with the questions submitted, establish our constitutional duty to answer, although the subject-matter of the inquiry does not directly relate

to the power or duty of the body making the inquiry. "The 74th article [of the constitution] authorizes each branch of the legislature, as well as the governor and council, to require the advice of the justices of the supreme court upon important legal questions pending in the body entitled to the advice, and awaiting the consideration and action of that body in the course of its legislative or executive duty." *In re School-Law Manual*, 63 N. H. 574, 576. In giving such opinion, the justices do not act as a court, but as the constitutional advisers of the body requiring their opinion. *Opinion of the Court*, 60 N. H. 585. It is the duty of the governor, with advice of council, to call the legislature together "sooner than the time to which it may be adjourned or prorogued, if the welfare of the state should require the same." Const., *art.* 49. As it appears that the question whether there is occasion for such action is now before the governor and council, and that their determination of that matter depends upon the solution of the questions submitted, the legal questions thereby presented are pending before and must be decided by them, in the performance of official duty. That the calling of the legislature together at the present time is seriously considered establishes the existence of the solemn occasion of the constitution; and the fact that the legal questions suggested are considered determinative of the duty of the executive renders them, whether difficult or otherwise, important questions of law.

The substance of the questions submitted is whether the New England Breeders' Club is authorized by its charter to maintain a common gambling place or permit the use of its premises as such, if the promoting or permitting of betting, book-making, or pool-selling upon horse-races constitutes that offence. It is more convenient to consider first the second question: whether the acts described in the first question are forbidden by law. The only section of the statute directly applicable is as follows: "If any person keeps any house, shop, or place resorted to for the purpose of gambling, or lets any such place for that purpose, or suffers any person to gamble in any way in any such place, which is under his care or control, he shall be fined not exceeding two hundred dollars, or be imprisoned not exceeding one year." P. S., *c.* 270, *s.* 6. If pool-selling, book-making, or betting upon horse races is gambling within the meaning of this section, the second question must be answered in the affirmative.

Words in a statute are to be construed according to the common and approved usage of the language, unless they have acquired a peculiar and appropriate meaning in the law, or from the context or manifest purpose of the legislature it is apparent a different meaning was intended. P. S., *c.* 2, *ss.* 1, 2. It might be difficult

to maintain the proposition that to bet, purchase and sell pools, and make books upon the racing of horses was not " to gamble in any way," in the common acceptation of the term. Pool-selling and book-making are described as forms of gambling by writers of authority. See N. Y. Const., *art.* 1, *s.* 9; *People* v. *Fallon*, 152 N. Y. 1, 5; 9 Messages of the Presidents 94 (veto message of President Harrison). From the manner in which they are repeatedly classed with gambling in sections 4 and 6, chapter 232, Laws 1905, to which our attention has been directed, it is plain these practices were understood by the draftsman of the act to be at least intimately associated with gambling. But it is not necessary to give any particular weight to this consideration to ascertain the meaning of the legislature. That sufficiently appears from the context and the legal meaning of the terms.

" Pool-selling " or " book-making," in connection with the racing of horses or otherwise, are not defined or denounced in terms in the public statutes, and we think are not mentioned at all except in chapter 232, Laws 1905. In *Barker* v. *Mosher*, 60 N. H. 73, it appeared that pool-selling was a method of betting and wagering money upon a horse-race. The two terms appear to be classed with betting, in the communication submitted, as race-track gambling, and are defined in the dictionaries as methods of betting or wagering money upon the result of such races or other contests. It is therefore assumed that the terms are to be understood as defining some method of betting or wagering money upon such events. A " bet or wager " is defined by section 18, chapter 270, Public Statutes, as " any contract or agreement for the purchase, sale, loan, payment, or use of money or property, . . . the terms of which are made to depend upon, or are to be varied or affected by, any uncertain event in which the parties have no interest except that created by such contract or agreement." By the two preceding sections, such contracts are declared void, and the losing party is given a right to recover of the winner any money or property paid on any such contract or agreement. While all wagers or bets are void, all betting is not prohibited; but certain bets are classed as gambling and prohibited. " If any person shall gamble, or bet on the sides or hands of such as are gambling or playing at any game, . . . he shall be fined not exceeding two hundred dollars, or be imprisoned not exceeding one year." P. S., *c.* 270, *s.* 7. By the next section, a " gambler " is defined as " every person who plays at a game of chance or skill in a place which is resorted to for the purpose of gambling, unless it be shown the game was for amusement only, without a stake or possibility of gain or loss, and every person who is present at such a place when any game or sport is being played for money or other

stake." Under these provisions, it is immaterial whether the game upon which money is risked or wagered is a game of skill or chance, or a game more properly denominated a sport; for since all the sections are to be read together, it is plain the legislature could not have intended to define as a gambler one who did certain acts, or who was present where certain things were done, unless such acts were understood by them to be gambling.

The terms "gaming" and "gambling" are in their criminal sense synonymous (Web. Dict.; Cent. Dict.; 14 Am. & Eng. Enc. Law 666), and have been used interchangeably in our statutes. R. S., c. 220, ss. 3, 4; G. S., c. 254, ss. 6, 7, 8. The distinction between "betting" and "gaming" is that gaming always includes a wager, while betting is not gaming unless the wager be laid upon a game. "It is the betting upon the game that constitutes gaming, and those game or gamble who thus bet. . . . The word 'game' is very comprehensive and embraces every contrivance or institution which has for its object to furnish sport, recreation, or amusement. Let a stake be laid upon the chances of the game, and we have gaming." Cooley, J., in People v. Weithoff, 51 Mich. 203,—47 Am. Rep. 557; State v. Leighton, 23 N. H. 167, 171. This is the distinction which, as has been remarked, is made by our statute. A wager is not of itself an offence against the criminal law, and is not gambling (Winchester v. Nutter, 52 N. H. 507); but a wager on a game or sport is gambling, and is in terms declared to be an offence. In Winchester v. Nutter, it was not suggested that a squirrel hunt was a game, if any ground could be found upon which to base such a claim, and the question was not considered. The word "sport" was not introduced into the statute until 1881—ten years after the events passed upon in that case. Laws 1881, c. 36, s. 1. The decision therefore does not aid upon the present question, whether betting upon a horse-race is gaming. If horse-races, or "contests of speed, skill, and endurance" (Laws 1905, c. 232, s. 3), are games within the meaning of the statute, the betting or wagering of money thereon is gambling. "Game" is defined in the Century Dictionary as "a contest for success or superiority in a trial of chance, skill, or endurance." That the word "game," in a statute as to gaming or gambling, includes the racing of horses, is the conclusion reached with few exceptions by all the authorities, both English and American. Ellis v. Beale, 18 Me. 337,—36 Am. Dec. 726; Cheesum v. State, 8 Blackf. 332,—44 Am. Dec. 771; Tatman v. Strader, 23 Ill. 493; People v. Weithoff, 51 Mich. 203,—47 Am. Rep. 557; Shropshire v. Glascock, 4 Mo. 536,—31 Am. Dec. 189; State v. Stripling, 113 Ala. 120,—36 L. R. A. 81, 82. The games of classical antiquity—the Olympic, Pythian, Nemean, and Isthmian games of Greece and the Ludi Appollinares at Rome—

included chariot-races and races on horseback. Cent. Dict.; 10 Enc. Brit. 63, 64; *Tatman* v. *Strader*, *supra*. Betting upon horse-races is equally within the mischief of the statute with wagers upon baseball or football contests, which are clearly games. There is no solid ground upon which to cast any doubt upon the legislative meaning in the use of the word "game," unless an investigation of the history of the statute should disclose that the word has acquired a technical meaning in the law which would exclude contests of this character.

But the history of the legislation against gambling shows that the word includes, instead of excludes, the racing of horses. Originally, at common law, gaming was not an offence; but it was regulated by statute in England long before the independence of this country. 4 Bl. Com. 172. The statute of 16 Car. II (*c.* 7; 1664), was entitled "An act against deceitful, disorderly, and excessive gaming," and applied to "playing at or with cards, dice, tables, tennis, bowls, skittles, shovel-board, or in any cock-fightings, horse-races, dog-matches, foot-races, or other pastimes, game, or games whatsoever." Section 2 prohibits fraud in the matters specified, while section 3 denounces, as immoderate and excessive, gaming whereby more than one hundred pounds should be lost at any time or meeting, in playing "at any of the said games, or any other pastime, game, or games whatsoever," or by betting "on the sides or hands of such as do or shall play thereat," and provides that the loser shall not be compelled to pay the sums so lost, and that the winner shall forfeit treble the amount won above said sum, one moiety to the king and one to the prosecutor. The statute of 9 Anne (*c.* 14; 1710), entitled "An act for the better preventing excessive and deceitful gaming," provided (*s.* 2) that "Any person . . . who shall at any time or sitting, by playing at cards, dice, tables, or other game or games whatsoever, or by betting on the sides or hands of such persons as do play at any of the games aforesaid, lose to any one or more person or persons so playing or betting in the whole the sum or value of ten pounds, and shall pay or deliver the same, . . . shall be at liberty" within three months to sue for and recover the same. If the loser did not within said three months sue therefor, any person might sue and recover treble the amount, one moiety for the use of the prosecutor and one for the poor of the parish. The statute further provided (*s.* 5) that if any person should in like manner, "in playing at . . . any of the games aforesaid, . . . at any one time or sitting" win more than ten pounds, he might be indicted therefor, and upon conviction should "forfeit five times the value of the sum or sums of money or other thing so won." Although horse-races were not expressly mentioned in the latter statute, it was determined in England that they were within the

mischief of the act; and in view of their inclusion in the statute of Charles II, it was held that the word "games" included pastimes or sports of this description. *Goodburn* v. *Marley*, 2 Str. 1159; *Lynall* v. *Longbothom*, 2 Wils. 36; *Blaxton* v. *Pye*, 2 Wils. 309; *Brown* v. *Berkeley*, Cowp. 281; *Whaley* v. *Pajot*, 2 B. & P. 51; *Thorpe* v. *Coleman*, 1 C. B. 990, 1000; *Tollett* v. *Thomas*, L. R. 8 Q. B. 514, 517. These statutes, being adopted and in force while this state was a royal province, if adapted to our conditions became part of the common law of the state. *Meehan* v. *Bachelder, ante, pp.* 113, 114; *State* v. *Saunders*, 66 N. H. 39, 72, 73; *State* v. *Leighton*, 23 N. H. 167, 171; *Lord* v. *State*, 16 N. H. 325, 330; *State* v. *Rollins*, 8 N. H. 550. If part of our common law, they appear to have been the only law on the subject until 1842, except the provision relating to offences against the police of towns,—"No person shall use any juggling or unlawful games or plays, or play at any game whatsoever for money or other property" (P. S., c. 264, s. 5),—which originated in the act of June 28, 1823, an act in relation to the police of Portsmouth.

In 1842, in chapter 220 of the Revised Statutes, three sections (*ss.* 3, 4, 5) were adopted which are the foundation of the sections now under consideration. The two latter sections, like the statute of Anne, punish not the gaming, or the betting upon the sides or hands of those who are gaming, but the winning by such means. They appear to have been adopted from section 14, chapter 50, Revised Statutes of Massachusetts, the original of which was enacted in 1742. *Grace* v. *McElroy*, 1 Allen 563, 566; Ancient Char. & Laws Mass. Bay, c. 218. The latter statute is in the language of the statute of Anne, except that instead of denouncing the winning of sums above ten pounds at any one sitting, it punishes the winning by playing, or by betting on the sides or hands of such as do play, of any sum or sums of money, or any valuable thing whatsoever. Our present statute must have used the words "any game" in the sense they were used in the acts from which it was derived. It is a familiar principle, that when the legislature adopts a statute from another jurisdiction it adopts as its meaning the judicial interpretation which has been put upon the words used, unless it appears that a different meaning was intended. *Parsons* v. *Parsons*, 67 N. H. 419, 420. The word "game" in the statute against gaming has therefore acquired a meaning in the law which is not inappropriate, and includes horse-racing. As betting on such races is forbidden by law, such action is illegal gaming. In Massachusetts it is. held that the word "games" in the Revised Statutes (*c.* 50) has the meaning it had in the statute of Anne. *Grace* v. *McElroy*, 1 Allen 563. Such, as has been said, is the general holding of the authorities. Some cases to the contrary are put upon peculiarities of the local

law, or on the ground that horse-racing, if a game, is not a game of chance,—a distinction inapplicable under our statute. As we are of opinion that betting upon a horse-race is illegal gaming or gambling, the second question is answered in the affirmative by section 6, chapter 270, of the Public Statutes.

We are unable to discover in chapter 232, Laws 1905, evidence of an intention to authorize the grantees or other persons to do upon the grounds of the corporation acts which are forbidden elsewhere. The corporation are authorized to hold races and contests of speed, skill, and endurance, and to offer purses, prizes, premiums, and sweepstakes (*s*. 3). So by implication are other associations. Laws 1895, *c*. 73, *s*. 1. The contesting for a prize or premium offered by another, which the one offering must lose in any event, is not gaming, either in the contestants or in the one offering. *Harris* v. *White*, 81 N. Y. 532; *People* v. *Fallon*, 152 N. Y. 1, 12. If the use of the word " sweepstakes " authorizes a kind of race otherwise illegal, betting upon such a race would nevertheless be unlawful. *Clayton* v. *Jennings*, 2 W. Bl. 706. The corporation are nowhere authorized to promote, or permit, betting, pool-selling, or book-making, but by section 5 it is made their duty to prohibit upon the grounds " any betting-room, ring, or enclosure for the placing of bets or wagers, for the selling of pools or making of books, or for any other device or system for placing bets, wagers, or money upon the result of any trial or contest of speed or power of endurance taking place upon said grounds." By section 6, they are required to post notices that all pool-selling, book-making, or any form of gambling is prohibited; and it is by section 4 made the duty of the police officers to remove from the grounds all persons violating these rules, which the corporation are impliedly, at least, required to make if such practices were not forbidden by law, Sections 7 and 8 give a civil action for the recovery of money or the value of property wagered or deposited upon any bet or the purchase of a pool. Each section concludes: " This penalty is exclusive of all other penalties prescribed by law for the acts specified in this section."

The original of these sections is to be found in section 17, chapter 570, New York Laws 1895. The New York constitution provides (*art*. 1, *s*. 9): " Nor shall any . . . pool-selling, book-making, or any other kind of gambling hereafter be authorized or allowed within this state." Under this provision and the general principle that the legislature could not be presumed to have intended to violate the constitution, it was held in New York that the acts specified still constituted a crime, and that the only effect of the provision was to reduce the punishment from that prescribed by general law to the recovery in the civil action of the value of the money or property wagered. *People* v. *Fallon*, 152

N. Y. 1, 10, 11, 12. If our construction of the language is governed by the meaning given to it in New York before its adoption here, it follows that here, as there, the acts specified in sections 7 and 8 are illegal and criminal; but the principle that the legislature cannot be presumed to have intended to violate the constitution may in New Hampshire require a different conclusion. "In some states the growing evil of special legislation has been met by a constitutional amendment prohibiting it in cases for which provision can be made by general law, and requiring that laws of a general character shall have a uniform operation throughout the state. Cool. Con. Lim. (6th ed.) 152. In this state legal effect has been given to the general declarations of the bill of rights, in which uniformity and equality are laid down as a rule of government, and such an amendment would be a mere enactment of our settled construction. . . . Without uniformity there is no equality. Without equality there is no law in the constitutional sense in which the word 'law' is used in this state. This sense has been so often declared here, and so long and so vigorously maintained, that it cannot be considered an open question, except in a constitutional convention where a proposed revolution in the fundamentals of government can properly be discussed. . . . Without equality nothing is secure. The settled constitutional right of equal privileges and equal protection under general law rests on incontestable grounds of wisdom and necessity. The equal protection of the laws recently inserted in the federal constitution has been a New Hampshire doctrine one hundred and ten years; and it has been maintained here in a breadth of meaning and scope of practical operation unknown elsewhere." Unreported opinion by Doe, C. J.; Opinion of the Justices, 4 N. H. 565, 572–574; McDuffee v. Railroad, 52 N. H. 430, 454, 455; State v. Express Co., 60 N. H. 219, 236, 250, 251, 256; State v. Pennoyer, 65 N. H. 113, 114, 115, 117.

If the sections were intended to exempt from criminal punishment the persons offending upon the grounds of the corporation, the legislation would not be a general law applicable to particular places (State v. Griffin, 69 N. H. 1), but would constitute an attempt to confer special privileges upon particular persons. As the corporation may locate anywhere in the state and change their location as often as they please, under such an interpretation of the sections they would carry with them from place to place the freedom of their patrons from the restraints of law which affect the patrons of all similar organizations. If the legislature has power to provide that an act generally punishable by fine and imprisonment shall on the grounds of the corporation subject the offender merely to a civil liability, they can as well authorize others to maintain places where murder, rape, or robbery shall

create merely a liability to respond in damages to the person injured. Only the clearest and most unmistakable language could justify a New Hampshire court in imputing such an intention to the legislature. In the act under consideration, for the legislature to require police officers "to prevent all violations of law with reference to pool-selling, book-making, and gambling, arrest any and all persons violating such provisions, and to convey such person or persons, so arrested, before a magistrate having jurisdiction of such offence, to be dealt with according to law," implying existing provisions of law denouncing such acts as offences against the law, and in the same act to repeal all criminal punishment therefor, would be beneath the dignity of the legislature and would be such an exhibition of idle trifling as the court would hesitate to ascribe to a co-ordinate branch of the government.

No title can be acquired to any money or property by gambling or betting. P. S., c. 270, ss. 15, 16. A recovery in a civil action for property against one without title thereto is in no sense a punishment for the possession of it. While by the word "penalty" may be understood punishment inflicted by law for its violation, such is not its only definition. It includes also an equivalent by way of damages for a civil wrong. Bouv. Law Dict. The latter meaning is applicable to the remedy given by these sections. It would seem more probable, in view of the constitutional rule of uniformity prevalent in this state and the general purpose of the act, that the two sections were understood by the legislature to give a civil remedy to the party injured, leaving the criminal remedy of the state unaffected. There may be other considerations supporting this conclusion, but it is not now necessary to express an opinion whether the view taken in New York or that which would ordinarily control in New Hampshire should prevail. The language must be interpreted in one way or the other. Under either construction, the acts specified are offences against the law and constitute illegal gaming.

Upon the assumption, therefore, that book-making and pool-selling are merely forms of betting, we are of the opinion that chapter 232, Laws 1905, does not empower the New England Breeders' Club to promote or permit upon their grounds betting of such character upon the races and contests of speed, skill, and endurance which they are authorized to conduct, and that to promote such acts is forbidden by the law of the state.

FRANK N. PARSONS.<br>
WM. M. CHASE.<br>
REUBEN E. WALKER.<br>
GEORGE H. BINGHAM.<br>
JOHN E. YOUNG.

March 13, 1906.