Strafford,
March 3, 1931.

STATE

*v.*

MINT VENDING MACHINE No. 195084 and
ALPHONSE LACASSE,
(LEON GRONDIN, *Claimant.*)

*Burt R. Cooper*, solicitor, for the state.

*Albert P. Sherry*, for the defendant and claimant.

SNOW, J.  The issue presented involves the construction of the statute.  Is the machine a "gambling implement" within the meaning of section 11, and was the "use" made of it, or for which it was kept or provided, "unlawful gaming" within the terms of section 10?  The state makes no claim that a slot machine which dispenses merchandise of a uniform value at a fixed price is a gambling implement.  It's position in argument is that section 11 of the statute is aimed at the evil of hazarding money on any chance; that the legislature used the words "any other thing" in their unlimited sense, and by "thing" did not mean a thing of value measured in terms of money or trade; that the slugs or tokens and amusement sought are "other thing[s]" within the meaning of the statute.

To gamble is to play, or game, for money or other stake; hence to stake money or other thing of value on an uncertain event.  Web. Dict.; to play a game of chance for stakes.  Stand. Dict.  The two essential elements are a hazard and a stake.  As commonly understood, gambling involves, not only chance, but a hope of gaining

something beyond the amount played, or, as it is frequently expressed, the chance of winning something for nothing. That the machine, here, involved the element of chance is too clear to require comment. The only doubtful issue presented is whether the legislature, by the use of the words "any other thing," intended either to dispense with the requisite of value in the stake played for, or to so limit or qualify the requirement of value therein that the tokens, or the fortunes perchance purchasable therewith, shall be deemed sufficient stakes to constitute the machine a gambling appliance?

Upon this issue the known legislative attitude toward the evils of gambling is of first importance. The history of the law of gambling in this jurisdiction, as respects the character of the stake and its sufficiency to constitute the offense, discloses a tendency to extend the subject-matter played for to every conceivable object, and to minimize the requirement of value therein. The mischiefs inveighed against, and the generally progressive severity of the penalties imposed, show a legislative purpose to suppress any exercise of the games or implements denounced as instruments of gaming which tends to encourage the gambling instinct.

"Gaming" and "gambling" in their criminal sense are synonymous and have been used interchangeably in our statutes. *Opinion of the Justices*, 73 N. H. 625, 628. Originally, at common law, gaming was not an offense. It was regulated however, by English statutes in force while this state was a royal province, which became a part of our common law so far as adapted to our conditions. *State* v. *Rollins* 8 N. H. 550, 560. These statutes related only to deceitful and excessive gaming and were at first applicable only where the stakes were one hundred pounds or more, 16 Car. II (*c.* 7, 1664), but later were extended to gaming where the stakes were of ten pounds or over, 9 Anne (*c.* 14, 1710), *Opinion of the Justices, supra,* 629. The keeping of a common gaming house was, however, an indictable offense at common law. 4 Black., Comm. 168. In *Lord* v. *State*, 16 N. H. 325, 330, it was held that a common gaming house was indictable at common law as a nuisance "because they are temptations to idleness and because they are apt to draw together great numbers of disorderly persons." The court sustained a charge that "keeping a house where cards or dominoes are habitually played for the purposes above named [something to eat and drink] would constitute the offence of keeping a common gaming-house." It was there said: "These mischiefs are quite as likely to result from the kind of gaming described . . . as from gaming for money whether in large sums or small."

During provincial times and our early statehood, the laws passed with relation to gaming were applicable only to the practice in public houses. An act of the general provincial assembly, 1679, forbade an innkeeper to "suffer . . . any kind of gaming, in or about his house, for mony or mony's worth, liquors, wine, beer, or the like; On fforfeiture of forty shillings . . . by the . . . Keeper of such house: And Ten shillings by each gamester for every such Offence." 1 N. H. Laws 21. In 1694 by an act entitled "An act to prevent Expence of time & Gameing in ordinaryes" it was provided "That no Person . . . shall play at Cardes, dice Tables, nine pines or other games, for money in or aboute any Publick house of Entertainem't on penalty of three Shillings four pence fine . . . To be paid by the Person so gameing for mony And ten shillings ffine to be paid: by the Keeper . . . " Id. 569. In 1721 by an act entitled "An Act for the Preventing of Gaming in Publick Houses" it was provided "Whereas it is very obvious that many persons offten Resort to Public Houses to Spend their Time in Gaming to the Great Scandall of Religion and the Impovrishm't of many Families, For Preventing whereof Be it enacted . . . That no Taverner, Inn-Keeper, Ale House keeper or Victualler, shall have or keep in or about their Houses, out Houses, yards, Backsides, Gardens or Places to them belonging any Dice, Cardes, Ninepins, Tables, Bowls, Shuffle board, Billiards, or any other Implements used in Gaming, nor Suffer any person or persons . . . to use or Exercise any of said Games, or any other unlawful Game or Sport . . . on Pain of forfeiting the Sum of Twenty shillings for Every such offence . . . and Every person Convicted of Playing as aforesaid . . . shall forfeit the Sum of five shillings . . .". 2 N. H. Laws 358. In 1754 the penalties here imposed upon the taverner and player were each increased to ten pounds and the former "disabled for ever after to obtain or have a license to keep Tavern." 3 N. H. Laws 86. In 1778 these acts were repealed and a similar act passed increasing the penalty to the taverner to twenty pounds. The act further provided that "No Person shall play at any . . . of the Games aforesaid or use & exercise the Implements aforesaid or any other Implements used in gaming, at any licensed house . . . under the Penalty of Six pounds for every such Offence." The reason expressed was that "Gaming in licensed Houses is attended with pernicious Consequences." 4 N. H. Laws 201. Subsequent changes in phraseology and penalties imposed are to be found in an "Act regulating licensed houses" passed 1791. Laws, 1805, p. 337. By an act entitled "An Act against gaming at Billiards" (1798), possession or custody of a billiard table subjected

the possessor to a penalty of ten dollars and costs as often as it is "found in his, her or their possession." *Id.* 282.

In 1771 in an act to prevent disorders on Christmas day in Portsmouth it was provided "And Whereas on Public Days of any kind ... it has been Common for Negros & Servants to exercise & Practise Sundry sorts of games for money which may tempt them to pursue unlawful means to furnish themselves with money for that purpose therefore all such sorts of Gaming or playing in the streets highways or public places is hereby forbid—" 3 N. H. Laws 564. In 1823 in an act to establish a system of police for Portsmouth (see also Laws 1807, *c.* 63) it was provided that any person who shall within said town "use any juggling or unlawful games or plays" or "play at any game whatsoever for money ... shall be ... deemed an offender." Laws 1823, *c.* 33, *ss.* 2, 3. This was made of general application to towns in 1842 by Rev. St. *c.* 113, *s.* 4, which provided that "No person shall use any juggling, or unlawful games or plays, or play at any game whatever for money or other property." This provision has since been retained without substantial change, except that the maximum penalty, in case of imprisonment, has been increased from the term of thirty days to six months. P. L., *c.* 378,*ss.* 5, 23.

General provisions as to gaming were first adopted at the same time, 1842, in R. S., *c.* 220. Section 3 thereof imposed a fine or imprisonment upon any keeper of a gaming house or place who shall permit any person to play "at ... any game whatever therein, for money, hire, gain or reward, or to bet on the hands or sides of such as are so playing"; while sections 4 and 5 thereof subjected the winner of "money or goods to the value of five dollars or more," at such gaming or betting, to a penalty of double the amount or value of the money or goods so won, and the winner of money or goods of lesser value to a penalty of not less than two, nor more than ten dollars. Under this statute it was held, on an indictment for permitting gaming in the defendant's gaming place, that playing for the hire of a billiard table, one shilling, was gaming for money. *State* v. *Leighton,* 23 N. H. 167, 170. No change was made in this statute until 1867, when, for sections 4 and 5, there was substituted a provision imposing a fine from twenty-five to two hundred dollars, or imprisonment for one year, upon "Whoever shall gamble, or bet on the sides or hands of such as are gambling or playing at any game"; and a section was added defining a gambler as follows: "Every person ... playing at any game of chance or skill, in any ... place resorted to for the purpose of gambling or amusement, shall be deemed to be a gambler, unless it is shown that

he and the others with him were playing for amusement only, without any the least stake or possibility of gain or loss whatever." G. S., c. 254, ss. 7, 8; G. L., c. 272, ss. 7, 8 (1878). By Laws 1881, c. 36, s. 1, this provision was made to apply to all persons found present at any game or sport played for money at a common gaming-house, while, by ss. 2, 3 thereof, it was enacted that "all implements for gambling or gaming apparatus used or kept and provided to be used in unlawful gaming in any . . . place resorted to for unlawful gaming, . . . shall be adjudged forfeited." In the codification of 1891, s. 8 of c. 272, G. L. was changed to read "Every person who plays at a game of chance or skill in a place which is resorted to for the purpose of gambling, unless it shall be shown that the game was for amusement only, without a stake or possibility of gain or loss . . . shall be deemed to be a gambler." P. S., c. 270, s. 8. Comm'rs Rep., P. S., 1890, p. 858. Such was the state of our statute law in 1901, when the slot machine statute here in question was enacted.

At that time (1901), slot machines dispensing by chance money, or trade checks redeemable in money or merchandise, had come into common use in this state and elsewhere. Their manifest lure to improvidence was such as to induce prosecutions, and to lead to added legislation directed to their suppression, in many jurisdictions. Our legislature dealt with the subject by a sweeping declaration that "Any slot machine . . . intended for the purpose of winning money or any other thing by chance or hazard" is "a gambling implement," and subjected such machines to the laws relating to such appliances. The legislative attitude toward gambling, evidenced by previous enactments, points to the conclusion that the statute was directed to the suppression of the ostensible evil presented by such machines, namely, that of hazarding money on chance in gratification of the gambling instinct. The words used adequately disclose such purpose, and are subject to no implication which will frustrate it. The antecedent legislative declarations that one playing a game of chance in a place of amusement is to be deemed a gambler, in the absence of proof that he was "playing for amusement only, without the least stake or possibility of gain or loss whatever" (G. L., c. 272, s. 8) or, as later phrased, "without a stake or possibility of gain or loss" (P. S., c. 270, s. 8; P. L., c. 384, s. 8), prepares us better to appreciate the significance of the absence of any words qualifying "things." The force of such omission is to minimize the requirement of value in the stake played for, so far as value might otherwise be deemed essential to the idea of gambling. The language used, "money or

other thing" in the absence of further qualifying words, discloses an intention that the gambling character of the implement shall not depend upon the worth of its output measured in money. By tacitly suppressing the emphasis upon the value of the stake the legislature disclosed a purpose to accentuate the element of chance and the pernicious consequence of the practice of squandering money in its pursuit. The act drives at the evils of indulging the natural tendency to gamble by disregarding, as far as may be, the element of value in the stake. If it could be said that the qualifying words "of value" are to be implied, the phrase read in the light of the legislative purpose would be no more than a concrete expression denoting any inciting force sufficient to induce the risk. It would be satisfied by any "thing" affording the necessary lure to indulge the gambling instinct. Any incitement which would impel the player to stake his money on a chance of winning would produce the evil consequences at which the enactment is aimed. We have to conclude that it was the intention of the legislature to declare a slot machine a gambling implement whenever the thing played for was a sufficient inducement to its patrons to encourage them to hazard or chance money beyond the purchase of the article which the machine vends, if any.

The fact that profits from the customary use of the machine was expected to yield returns under the lease of its owner to the defendant Grondin by stimulating sales tends to show that the fortunes exhibited represented a value to the owner. This value lay in the capacity of such exhibition to excite the gambling instinct of the operator and thereby to induce excessive purchases of mints. If the satisfaction of having one's fortune told is sufficient moment to an operator to induce the spending of his nickels therefor it must have an inciting value to him. Such value to him is demonstrated by the purchase. It is unimportant that the thing purchased had no money value. If the "thing" obtained were a theater ticket, although for the exclusive use of the operator, no one would question but it is a "thing" of value, notwithstanding it is solely for the operator's present amusement. The same is true of a ticket or token entitling the player to have his fortune told. The difference is only one of degree. The fact that one pretending to tell fortunes is subject to imprisonment (P. L., c. 378, s. 24) cannot be set up in defence of the machine. To be sure dispensing theater or fortune telling tickets may be presumed to have cost the owner of the machine something. But so does the exhibition of the printed fortune by the production and maintenance of the complicated mechanical fortune teller.

While the plea of guilty by Lacasse was not evidence against the machine, the claimant appears to have conceded that the pool room was a building resorted to for unlawful gaming by resting his claim solely upon the construction of the statute.

It is our conclusion that the slot machine was a gambling machine, and the use made of it an act of gambling, within the meaning of the statute. *Ross* v. *Goodwin*, 40 Fed. Rep. (2d) 535. See *Green* v. *Hart*, 41 Fed. Rep. (2d) 855. The order here must therefore be

*Judgment of forfeiture.*

All concurred.