14976

ALEXANDER *ET AL.* v. MARTIN, SHERIFF, *ET AL.*

(6 S. E. (2d), 20)

*Messrs. Hughs & Hughs,* for petitioners.

*Messrs. John M. Daniel, Attorney General, J. Ivey Humphrey* and *M. J. Hough, Assistant Attorneys General,* for respondents.

December 6, 1939.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

This proceeding was by permission instituted in the Original Jurisdiction of this Court, to restrain the respondents,

State, county, and municipal law enforcement officers, from seizing and destroying or otherwise interfering with the operation of petitioners' machines, which are described as electrical and mechanical devices, and otherwise denominated as pin boards, pin tables, marble boards, and the like.

The petition alleges that the machines are not gambling devices within the purview of Section 1301-A, Code, of 1932, but on the contrary that they are legitimate devices which are played for amusement only, and that there is no pay-off or return to the player other than the value to him of the amusement which the playing of the machine affords. It is alleged that this value is uniform and certain upon every play to every player.

By Section 101 (1) (a) of Act 346, 41 St. at Large, p. 650, approved the 1st day of July, 1939, it is provided, among other things: "That every person, firm or corporation owning or maintaining any place of business, or other place, wherein or in connection with which is operated or located any machine for the playing of music, games or amusements, operated by a slot wherein is deposited any coin or thing of value or any machine in which is kept any article to be purchased by depositing any coin or thing of value, shall apply for and procure from the South Carolina Tax Commission a license for the privilege of operating any and every such machine and shall pay for such license a tax of Fifteen ($15.00) Dollars * * *."

It is further provided in Subdivision (5) of the above section: "The issuance of the license under the provisions of this section by the South Carolina Tax Commission shall not make lawful the operation of the gambling machine or device, the operation of which is made unlawful under the laws of this State."

It appears that the machines are being operated under a license issued to the petitioners for their various machines by the South Carolina Tax Commission under the authority of the above section.

The respondents, on the 29th day of August, 1939, and other days prior thereto, deeming that the machines were gambling devices and fell within the prohibition of Section 1301-A, seized and destroyed various and sundry of the licensed machines, after taking them before a magistrate, who ordered their destruction under Subdivision (2) of Section 1301-A.

It is alleged that the respondents have declared their intention to seize and destroy all of the machines of the petitioners within the State of South Carolina, and that if petitioners are not protected in their property rights against the unlawful trespasses of the respondents, they will suffer irreparable injury; they further allege that they are without adequate remedy at law.

Upon the verified petition, a temporary restraining order was issued by a Justice of this Court, which directed the respondents to show cause at the time and place named in the order, why the injunction should not be made permanent. The respondents made return and answer to the petition, in which they alleged that the machines are operated as gambling devices, not giving a uniform return, but giving different results at different plays when operated by the same or different players, and that the score registered at each or different plays is not determined by the skill of the player, but is a matter of chance or hazard. It is also alleged that the respondents acted under authority of a valid criminal statute, the enforcement of which the Court is without jurisdiction to restrain.

Attached to the foregoing return and answer are numerous affidavits describing the machines in question, and setting forth in detail the method and manner of their operation. The following description generally applies to all of the machines seized by the respondents:

"The machine, supported by four table legs, is about five feet in length, two feet wide, sixteen inches deep at the front of the cabinet, and eighteen inches at the back. The cabinet is covered with glass. There are twelve upright electric pins

in the machine. These pins are numbered from one to twelve. There is a backboard about two feet square with numbers ranging from one to twelve to correspond with the numbers on the pins in the cabinet.

"The player of this machine places a nickel in a slot on the left front of the machine. A knob on the right front releases five steel balls singly to a plunger just above the knob. The player releases the plunger against the ball and sends it through a slot to the top of the cabinet where it then becomes free to strike any number of the twelve pins. When a pin in the cabinet is struck by a ball the corresponding number to that pin is lighted in the backboard, if while shooting these five balls the player causes all twelve of the pins to be struck, and thus lights all twelve numbers in the backboard, he receives a game. Should the player cause all numbers in the backboard to be lighted with four balls, then each pin struck by the fifth ball allots him a free game. There are two small pegs near the front, or pocket, of the machine. If a ball strikes four pins before reaching these pegs, they become lighted. If a ball strikes a fifth pin the lights go out in these pegs. However, in the event a ball passes between these pegs on its exit, while these pegs are lighted, the player receives two free games. Whatever number of free games a player might gain, this machine is so constructed that it is not necessary to insert another coin until all free games are played. If a free game is in order all that is necessary to gain the five balls is to push the slot in where the original coin was inserted."

The score of a player is recorded on the score board at the head of each table, in a variety of ways, dependent upon the type of the table being used. It may be indicated by a number, or by pictures or symbols. According to the affidavits submitted by the respondents, there is no skill involved in playing the machines, but that the result is contingent upon chance. The player has no way of knowing in advance what his score will be, the score being unpredictable, and being determined solely by the particular metalic post or pin with

which the ball comes in contact. At one play or series of plays, the score may total one result, and at the next play or series of play a different result, whether manipulated by the same or by different players.

Petitioners assert that a certain measure of skill may be acquired in playing these machines, but make no denial of the fact that there is an element of chance in the resulting score. Nor do they deny that dependent upon the score a player is awarded free games. They insist that the games are played for amusement only. But it appears from at least one affidavit of the respondents that a successful player was paid off in money by the owner of a like machine in the City of Greenville.

Are the machines of the petitioners prohibited by the criminal statutes of South Carolina, and more particularly by Section 1301-A?

The above section makes it a criminal offense for one to keep on his premises, or to operate, or permit to be kept on his premises, or to be operated within the State, "any vending or slot machine, punch boards, pull boards, or other devices pertaining to games of chance of whatever name or kind, except automatic weighing, measuring, musical and vending machines which are so constructed as to give a certain uniform and fair return in value for each coin deposited therein, and in which there is no element of chance."

It is also provided in this section: "That this section is also intended to prohibit all vending, slot machines, punch boards, pull boards, or other devices pertaining to games of chance, that display different pictures, words, or symbols, at different plays, or different numbers, whether in words or figures, or which deposit tokens or coins at irregular intervals, or in varying numbers to the player or in the machine."

It is clear that the law condemns any devices pertaining to games of chance, of whatever name or kind, except certain types of machines therein mentioned which are so constructed as to give a certain uniform and

fair return in value for each coin deposited therein, and in which there is not element of chance. Petitioners argue that while in the playing of their machines there is present some element of chance as to the score which may be made, there is no hazard or chance involved in what the player receives —which is the amusement he derives from the playing of the game.

While it is true that the player receives the same number of balls for each coin deposited, he may or may not make the same score for each coin's worth of balls payed. This in itself is an element or contingency, dependent upon chance, and would make of the machine an unlawful device, inasmuch as the law above quoted condemns all vending or slot machines or other devices pertaining to games of chance, which display different pictures, words or symbols at different plays, or different numbers, whether in words or figures, or which deposit tokens or coins at irregular intervals, or in varying numbers to the player or in the machine.

In addition to this, contingent upon the score recorded for a player, free games are awarded. Therefore, it is clear that the lure and inducement to the player to operate the machine is the chance of occasionally being allowed to play a game or games without additional cost. This feature, we think, clearly pertains to a game of chance. And this is true, whether the machine is played for amusement or for other returns, such as money.

Amusement is recognized by the Courts as a thing of value, and where the amount of amusement given by the player of the machine is determined by chance or hazard, such machine is held to be a gambling device.

This Court said in *Harvie v. Heise,* 150 S. C., 277, 148 S. E., 66, 69: "In addition to what has been said, even if it should be conceded that it is the sincere purpose of the owner, that the checks be played only for the amusement of the operator, we cannot say that they have no value whatever; for it must be that the amusement or entertainment

furnished the player is worth something to him if it constitutes the inducement for him to operate the machine. It is idle to argue that he would spend his money and time in operating the machine for the purpose of obtaining something that is of no value to him—unless we impute to him the lack of that common sense which he is presumed to have. Further, especially in view of the high cost of amusement or entertainment and the immense sums paid for it by people of all classes, it is reasonable to suppose that the owners of the machines, if they expect the amusement or entertainment furnished to operate as an inducement to play, must consider it of some value to the operator." And see Annotation in 81 A. L. R., 177.

In *Harvie v. Heise, supra,* certain checks or tokens were irregularly released by the machine there under consideration, and it was claimed that such tokens had no trade or money value, but were intended to be used only in the operation of the machine by the player for his own amusement or entertainment. In other words, they entitled the player to continue his playing with these free tokens, without additional cost. The tokens were but symbols evidencing the right acquired by the customer who drew them. The thing actually received was the right to operate the machine without having to deposit an additional coin for whatever amusement the playing of the game would afford. It matters little whether this right was evidenced by tokens or by an automatic recorded score.

Other Courts have held amusement to be a thing of value. The Supreme Court of Ohio in the case of *Kraus v. City of Cleveland,* 135 Ohio St., 43, 19 N. E. (2d), 159, 160, had this to say:

"Amusement is a thing of value. Were it not so, it would not be commercialized. The less amusement one receives, the less value he receives, and the more amusement, the more value he receives. Whoever plays the device and obtains tokens therefrom receives more value for his nickel, with respect to the amount of amusement obtained, than the

player who receives none at all. The player who receives ten tokens receives more value for his nickel, with respect to the amount of amusement, than the player who receives only two. The player who receives fifty tokens receives more value for his nickel, with respect to the amount of amusement, than the player who receives only ten tokens. How ever, the number of tokens a player may receive is wholly dependent upon chance. Consequently, the amount of amusement a player receives for his nickel, by virtue of the return of the tokens, is dependent wholly upon chance. The greater the amount of amusement received, the more valuable the prize.

"The minimum amount of amusement offered in each play is that which is offered without any return of tokens. Whatever amusement is offered through the return of tokens is added amusement which a player has an uncertain chance of receiving. This added amount of amusement, the procurement of which is dependent wholly upon chance, is a thing of value (*Gaither v. Cate,* 156 Md., 254, 267, 144 A., 239; *State Ex Rel. Manchester v. Marvin,* 211 *Iowa,* 462, 464, 233 N. W., 486; *Painter v. State,* 163 *Tenn.,* 627, 45 S. W. (2d), 46, 81 A. L. R., 173; *State v. Mint Vending Machine,* 85 N. H., 22, 154 A., 224; *Rankin v. Mills Novelty Co.,* 182 Ark., 561, 32 S. W. (2d), 161), the lure extended by the device to the player.

"As well said in the opinion in *Myers v. City of Cincinnati,* 128 Ohio St., 235, 190 N. E., 569, 570: 'These decisions (holding certain slot machines to be gambling devices) appear generally to be based on the theory that devices of this kind encourage and stimulate the gambling instinct of receiving something for nothing, or more for less, and are in such contravention of sound public policy as to come within laws relating to gambling and the exhibition of gambling devices. * * * Even if the slot machine involved in this case is manufactured and intended for lawful operation, its potentiality and design is such that it may be easily put to unlawful use. The regulation or prohibition of

such a mechanism need not be postponed until such event occurs.' * * *

"Since amusement has value, and added amusement has additional value, and since it is subject to be procured by chance without the payment of additional consideration therefor, there is involved in the game three elements of gambling, namely, chance, price and a prize."

As heretofore stated, the fact that petitioners' machines do not dispense tokens or checks does not render this decision inapplicable.

It is claimed by petitioners that if the machines come within the purview of Section 1301-A, the Statute has been amended by Act 346, Acts of 1939, which authorizes a license tax on machines for the playing of music, games, or amusement, operated by a slot wherein is deposited any coin or thing of value. We think there is no merit in this contention. The Act of 1939, subsection (5), page 653, already quoted, provides that the issuance of the license by the South Carolina Tax Commission, "shall not make lawful the operation of the gambling machine or device, the· operation of which is made unlawful under the laws of this State." This provision clearly forbids the operation of a slot machine despite the fact that it be licensed, if it is unlawful under the laws of the State, whether it be played for amusement or otherwise.

The licensing of these machines by the State Tax Commission cannot make a lawful machine out of a gambling device, and the payment of the license does not authorize the operation of machines which come within the prohibition of Section 1301-A. *Hinkle v. Scott,* 211 N. C., 680, 191 S. E., 512; *Keeney v. State,* 54 Ga. App., 239, 187 S. E., 592.

The judgment of this Court is that the temporary restraining order heretofore issued be, and hereby is, dissolved, the permanent injunction denied, and the petition dismissed.

Mr. Chief Justice Stabler and Mr. Justice Carter concur.

Messrs. Justices Bonham and Baker dissent.

Mr. Justice Baker (dissenting).

I promise my dissent in this case upon what appears to me a reasonable construction of the language, "Pertaining to games of chance of whatever nature or kind"; and the difference, logical and inherent, between the lawful and unlawful use of a lawful thing. Evil can be made of lawful commerce as the difference between ticker tape spelling out during each business day the nation's commerce; and betting on prices of stocks and results of ball games shown by the same machine. Nor do I think the game can be declared as not involving skill of the player, and so protected. While there are affidavits in the record that the operation of these machines is purely a game of chance and involves no element of skill, such affidavits were based on the fact that affiants had played these machines a few times and were unable to determine in advance the probable score. Many a person plays french pool on the same basis, but nevertheless, french pool is admittedly a game of skill. If a record contained affidavits that certain streams of water (natural water courses) flowed uphill, we could not so find in the face of common knowledge that water does not so flow.

The Legislature intended to legalize such machines as were not *per se* gambling machines. Of course, all of these machines are potential gambling devices in the same light that all automobiles are potential "deadly weapons."

One is reminded of a humorous article appearing some years ago in one of the nation's great periodicals which could well have been headed, "Person up and Person down." In playing this game two rural residents on the top floor of a large hotel of one of the country's great cities bet on whether the greater number of people would pass along the street in one direction or another. The game of chance so played went up and down and waxed closer and closer until the lunch hour when everyone seemed to go in the same

direction. Then a band appeared in the center of the street below playing martial airs and attracted the crowd in the opposite direction. The question to be decided was not the gambling of the two contestants, but whether the hotel, the dinner hour, or the band was responsible for the result and to be condemned.

So it seems to me that unlawful acts of third parties are used to condemn a machine lawful under the Statute and so licensed after investigation by a department of our State Government. Nothing inherent in the machine is wrong. Unlawful acts of those who violate another Statute are made the criterion of the unlawfulness of the machine.

It appears to me that a reasonable and proper construction of the wording of the Acts protects the petitioner in the claim of right that he asserts; and that a machine must be, as aforesaid, *per se* unlawful before subject to confiscation. Betting on the side on games of pool, backgammon or chess should not condemn the games, even were they not expressly excepted by the terms of the Statute; nor should football be stopped because onlookers wager. Otherwise, the lawful acts of one are condemned by the unlawful acts of his neighbor.

Though involving different facts and a different Statute, the present case appears not near so strong on the general subject of gaming as *Darlington Theatres, Inc. v. Coker,* 190 S. C., 282, 2 S. E. (2d), 782, in which a more reasonable construction of the Statute appears to have been made.

MR. JUSTICE BONHAM concurs.