474 A.2d 545

**STATE of Maryland**

v.

**ONE HUNDRED AND FIFTY-EIGHT GAMING DEVICES and a Sum of Nine Thousand Eight Hundred and Nine Dollars.**

**No. 934, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

May 8, 1984.

Avery Aisenstark, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Lynette M. Phillips, Staff Atty., Warren B. Duckett, Jr., State's Atty. for Anne Arun-

del County, and Gerald K. Anders, Deputy State's Atty. for Anne Arundel County, on brief, for appellant.

Thomas C. Morrow, Baltimore, with whom were William K. Meyer and Joseph C. Jacobs, Baltimore, on brief, for appellee.

Argued before GILBERT, C.J., and WILNER and GARRITY, JJ.

GILBERT, Chief Judge.

If gaming is a spice of life, the spices in the instant case have been dished up to us in one hundred and fifty-eight assorted flavors.

This appeal arises from a petition by the State for the forfeiture of gaming devices seized from Willow Enterprises, Inc., a Maryland corporation (Willow).

Prior to the trial on the petition, Willow moved for summary judgment in its favor on the ground there was neither statutory nor common law authority for the forfeiture. Willow's motion was denied.

After the matter was heard in the Circuit Court for Anne Arundel County on the merits, the judge granted the State's petition "with respect to those gaming devices found to be 'slot machines' included within the 158 Gaming Devices and with respect to the sum of $9,809.00" taken from Willow's office. The trial judge further ordered that "gaming devices determined . . . not to be 'slot machines'" were to be returned to the owner.

The State appealed and devices cross-appealed. Inasmuch as this is an action *in rem*, and it is, in law, the devices that have cross-appealed, we shall for simplicity's sake refer to the appellees and cross-appellants as "Willow."

The State asserts, essentially, that the trial court erred in failing to declare that all of the devices were illegal gambling devices and, consequently, subject to forfeiture. The cross-appellant Willow avers that:

1) the trial court's delegation of forfeiture power to the State was an unlawful and unconstitutional delegation of judicial authority;

2) the trial court erred in applying a forfeiture penalty in the absence of explicit statutory or common law authority;

3) the trial court misapplied and misconstrued Maryland statutory and case law in holding that the forfeited devices are unlawful gaming devices; and

4) the trial court erred in declaring a forfeiture of the nine thousand eight hundred and nine dollars.

## Facts

Following an investigation, the Maryland State Police on December 30, 1980, procured and executed a search and seizure warrant upon Willow's headquarters located at 118 Roesler Road, Glen Burnie, Maryland. The police seized a variety of gaming devices, documents, and United States currency. Willow is said to be engaged in the sale, service and distribution of arcade and pinball machines, gaming devices, and vending machines. Willow's president and operator, Louis Wilner, was charged with unlawfully maintaining and possessing slot machines and lottery slips in violation of Md.Ann. Code art. 27, § 264B and § 362. On July 16, 1981, Wilner was adjudged by the district court to be guilty of those charges. Wilner did not appeal.

After Wilner's conviction, the State filed its petition for forfeiture of the currency and gaming devices that the State police had seized from Willow. The devices seized were of various makes, models, and designs. As a matter of convenience, the State introduced during trial on the petition, eleven devices that it claimed "exemplified all of the various gambling devices seized."

Although they varied, most of the seized devices incorporated "free play" or "game credit" features that rewarded the successful player with "free" replays, which were registered on a three or four digit meter attached to the ma-

chine.[1] The player was able to use the free plays by activating a "play" button on the machine.

Many of the alleged gaming devices were adapted with a "knock-off switch" and a "knock-off meter." The switch and meter enabled the machine owner to remove game credits from the machine while maintaining a tabulation of the total free plays actually won. A number of the seized devices had not yet been fitted with the knock-off switches or meters, but unattached meters were found at Willow's premises.

Forty-eight of the devices seized were Delta "Red, White and Blue" machines that issue stamps printed with randomly selected numbers. If the numbers on the stamps issued by the machine correspond with numbers on a chart that was placed on top of the machine, the player wins replays, coupons or merchandise.

The remaining devices were a variety of "one-arm bandits" which are activated by a player's depositing a coin in a slot and pulling a handle. The handle rotates reels which spin and then stop, revealing a combination of symbols, numbers, words or colors. If the combination of the reels corresponds with one of the predetermined winning combinations, the machine releases the "payoff" into a coin tray located on the lower front of the machine. With the exception of the one-arm bandit devices, none of the gaming machines had the capability of directly paying off to the player. The other devices required a third party to redeem "free games" for something of value that was more tangible.

The trial judge found as a fact that certain devices were slot machines and thus proscribed by art. 27, § 264B.[2]

---

1. Among these were the Sircoma "Draw-80 Poker" machine, the Sircoma "Dawg Race" machine, and the "Black Jack" or "21" machine.

2. The following were deemed by the trial judge to be slot machines subject to forfeiture: 1) Sircoma "Draw-80 Poker" with a knock-off switch, 2) Sircoma "Dawg Race" machine, 3) "Black Jack" device, 4)

Included within that finding were "partially dismantled" machines of the same type. He further found that the antique slot machine, the Delta Red, White and Blue machine without a knock-off device, all "similar free play devices," and all "inoperable" machines were not slot machines within the meaning of § 264B.

*Forfeiture vel non*

Before we reach the question of whether the devices seized in the matter *sub judice* were slot machines, we must first determine the State's right to institute forfeiture proceedings.

■■■ Property which becomes the subject of forfeiture is characterized as either contraband *per se* or derivative contraband. Contraband *per se*, that is, property that is inherently illegal, requires no forfeiture procedure in order to perfect the State's interest in it.[3] Derivative contraband, on the other hand is property that may be legal or illegal to possess depending upon the particular circumstances.[4] A determination that property is contraband, under the derivative theory, is made by application of the statute, if there be one, or by common law standards applied to the facts.

■■ The devices seized from Willow may or may not have a lawful, useful purpose. That being the situation, they may not be characterized as contraband *per se*. Whether the devices are derivative contraband requires a judicial determination. If the devices are found to be derivative contraband, they are subject to forfeiture.

---

"Black Jack" machine with knock-off switch, 5) Delta "Red, White and Blue" device with a knock-off switch, 6) Seeburg "one-arm bandit" slot machine with remote control, and 7) "Sweet Shawnee" slot machine. All other "similar" devices were also deemed subject to forfeiture as slot machines.

3. An example of contraband *per se* would be heroin or a machine gun.

4. An automobile, for example, is legal to possess under most circumstances, but if used in connection with a narcotics violation, it may be illegal under art. 27, § 297.

■ The authority for forfeiture in Maryland is derived from two sources, scilicet, common law or statute.[5] An integral part of each is four basic propositions: 1) forfeiture is a civil *in rem* proceeding, *Director of Finance, Prince George's County v. Cole,* 296 Md. 607, 618, 465 A.2d 450 (1983); 2) the guilt or innocence of the owner of the seized property is of little significance, *Bozman v. Office of Finance, Baltimore County,* 52 Md.App. 1, 10, 445 A.2d 1073 (1982), *aff'd* 296 Md. 492, 463 A.2d 832 (1983); 3) forfeitures are not favored in the law and should be avoided when possible, *Commercial Credit Corp. v. State,* 258 Md. 192, 199, 265 A.2d 748 (1970); and 4) the burden of proof necessary to sustain a forfeiture is that of a preponderance of the evidence, *Prince George's County v. Blue Bird Cab Co.,* 263 Md. 655, 659, 284 A.2d 203 (1971).

There is no statute in this State authorizing the forfeiture of the devices seized from Willow. The State's argument that the forfeiture of the devices is authorized by art. 27, § 264B(V) is lacking in merit. Section 264B(V) was enacted by Laws 1981, ch. 280. The section provides:

"V. It shall be a defense to any prosecution under paragraph III of this section if the defendant shows that the slot machine is an antique slot machine and was not operated for gambling purposes while in the defendant's possession. For the purposes of this paragraph, a slot machine is an antique slot machine if the defendant shows by a preponderance of the evidence that it was manufactured prior to 1941. Whenever this defense is offered, *no slot machine seized from any defendant shall be destroyed or otherwise altered until after a final court determination including review upon appeal, if any, that the defense is not applicable. If the defense is applicable, the slot machine shall be re-*

---

**5.** For a discussion of the history of forfeiture in the United States, *see Director of Finance of Prince George's County v. Cole,* 296 Md. 607, 616, 465 A.2d 450 (1983).

*turned pursuant to provisions of law providing for the
return of property."* (Emphasis added.)

The State, based upon the above emphasized portion of
the section, claims that, "[t]he General Assembly thus en-
acted a statutory defense for 'antique' machines that, but
for the defense, would be subject to forfeiture under
§ 264B. In doing so, the General Assembly quite clearly
recognized that the authority to forfeit and even 'destro[y]'
contraband slot machines already existed ...." We think
the State misinterprets the statute.

At best, the forfeiture authority embodied in
§ 264B(V) is inferential. It certainly is not clear enough to
pass muster under a strict constructionist theory, the inter-
pretation required in construing forfeiture statutes. *Com-
mercial Credit v. State, supra. See also* 37 C.J.S., *Forfei-
tures* (1943) § 4(b), where it is said:

"For a statute to be construed so as to produce a
forfeiture, its language must clearly show an intent to do
so; forfeitures are never to be inferred from doubtful
language."

To sustain the State's argument would necessitate that
we do precisely what we should not do, that is, infer
forfeiture.

The legislature provided in § 264(a) that the title to
"money, currency or cash ... seized or captured by ...
police ... in connection with any arrest or the playing of or
operation of ... any ... gaming device ... shall immediate-
ly vest in and to the local government ... or if seized by the
State ... to the State ... subject to a return to a claim-
ant." [6] We point to § 264(a) to illustrate the extent to
which the General Assembly has gone in expressing itself
with respect to forfeiture in gaming matters. We are
confident that had the legislature intended to provide in
§ 264B(V) for the forfeiture of gaming devices, it would not

---

**6.** Procedure for the forfeiture or return of seized money, currency or
cash is set forth in Md.Ann.Code art. 27, § 264(c) and (d).

have so done in the indirect and inferential manner attributed to it by the State.

■ The absence of a forfeiture statute, however, does not *ipso facto* dictate the return of seized property. There may be a forfeiture to the State under the common law if there is a three-pronged showing that: 1) the property cannot be used for any legitimate purpose; 2) the property was procured, used or held for an illegal purpose; and 3) there has been a finding of guilt as to the owner or user of the property. *Wagner v. Upshur,* 95 Md. 519, 52 A. 509 (1902). The third prong, the guilt or innocence of the owner or user, while of importance in earlier times, is no longer of significance, *Bozman, supra.* Nevertheless, it remains relevant with respect to proving the second prong. Absent a criminal conviction, the second prong may still be satisfied by a showing that the owner or user *intended* the property to be procured, held or used for an illegal purpose. Similarly, the first tine—that the property cannot be used for any legitimate purpose—mandates that the intended purpose be a legitimate one so as to avoid forfeiture.

■ It is difficult to imagine a situation in which property does not serve *some* legitimate purpose, even though ludicruous or farfetched. The proper emphasis in the first prong must be on the word "legitimate" rather than on the word "any." The State must show by a preponderance of the evidence that the owner or user of the seized items intended the property to be used illegally and that the items were procured, held or used for an unlawful purpose. Once the State satisfies that requirement, the property is presumptively deemed contraband. The presumption is not conclusive, hence it may be rebutted.

Having established that the State may cause the forfeiture of illegal gaming devices, we turn now to a discussion of § 264B in order to determine whether the devices in question were properly seized as illegal slot machines.

*Slot Machines*

Md.Ann.Code art. 27, § 264B declares, in pertinent part:

"Any machine, apparatus or device is a slot machine within the provisions of this section if it is one that is adapted for use in such a way that, as a result of the insertion or deposit therein, or placing with another person of any piece of money, coin, token or other object, such machine, apparatus or device is caused to operate or may be operated, and by reason of any element of chance or of other outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, coin, token or other object representative of and convertible into money, irrespective of whether the said machine, apparatus or device may, apart from any element of chance or unpredictable outcome of such operation, also sell, deliver or present some merchandise or money or other tangible thing of value."

The statute resulted from a study and report presented by the Emory Commission [7] at the behest of Governor J. Millard Tawes in 1962. The concerns of the committee were binary: 1) the abolition of slot machines in Maryland, with particular attention to Anne Arundel, Calvert, Charles, and St. Mary's Counties, and 2) effectuating an abolition of the machines with the "least possible damage to the economy" of those counties.

The Emory Commission Report contained an extensive analysis of gambling laws nationwide. The Commission pointed out that, "[t]he Federal Gambling Devices Act of 1962 makes the possession of any machine which may be used as a gambling device illegal without requiring proof of cash pay-offs." [8]

The report stated:

---

7. The report takes its name from Richard W. Emory, Esq., Chairman of the Committee, who wrote the report.

8. Report of the Slot Machine Study Committee, January 12, 1963, p. 12. It must be noted that the conclusions reached by the Committee

"[T]he distinction [made by the Federal Act] between 'free play' gambling devices and 'free play' amusement devices follows the Federal tax laws.... The difference between the two types of machines lies in their construction and operation. If the machine has an odds mechanism, provision for releasing free plays and a meter for recording free plays released, then it is a gambling machine. If the machine does not have such gambling features, its use for gambling is not considered practicable even though it may award free games in a limited number ....

The Federal tax regulations describe a 'free play' gambling device which must have a ... stamp, as follows:

'A machine which is operated by means of the insertion of a coin, token, or similar object and which, even though it does not dispense cash or tokens, has the features and characteristics of a gaming device, whether or not evidence exists as to actual payoffs.' " Report at 11–12.

The Emory Commission suggested procedures for the abolition of slot machines. It said:

"Any abolition of slot machines requires repeal of ... local laws ... legalizing cash pay-off machines. It also requires repeal or amendment of the General Laws permitting the licensing of 'free play' slot machines classified by the Federal government as gambling devices, and enactment of a State law at least as strong as the Federal Gambling Devices Act of 1962 prohibiting any machine, 'free play' or otherwise, which may be used as a gambling device." Report at 14.

In direct response to the report, the General Assembly enacted Laws 1963, ch. 617, which was codified as Md.Ann. Code art. 27, § 264B.

---

appear to be an amalgamation of the Federal Gambling Devices Act of 1962, 15 U.S.C. 1171 *et seq.*, and 26 CFR 45.4461–2 *et seq.* (Miscellaneous Stamp Taxes—Subpart C). Hereinafter, references to federal laws will include the Gambling Devices Act as well as the federal tax regulations.

The Court of Appeals in *Clerk v. Chesapeake Beach Park*, 251 Md. 657, 666, 248 A.2d 479 (1968), construed § 264B as "adopt[ing] the theory of the federal statutes which classify as gambling devices those pinball machines that can pay off in other than additional 'free plays,' but classify as permitted amusement devices 'free play' pinball machines." The obvious distinction is the payoff possibility.

The federal laws concerning gaming devices were not always as clear as they are today. The Federal Gambling Devices Act of 1962, 15 U.S.C. § 1171 *et seq.*, was an amendment and revision of the Slot Machine Act of 1951, 64 Stat. 1134. In summarizing the necessity for the enactment of the Federal Gambling Devices Act, the Court, in *Lion Manufacturing Corporation v. Kennedy*, 330 F.2d 833 (D.C.Cir.1964), penned:

"[T]he major thrust of the 1951 Act [was directed] to the then familiar and widely prevalent slot machine, or 'one-armed bandit,' as it is ruefully referred to by those addicted to the unequal sport it offers.[9] The use of this language is quite understandable since, at the time, the traditional 'slot machine' constituted the primary problem to be dealt with. Congress, however, failed to reckon with human ingenuity. New devices were developed which, although perhaps outside the definition in the Act, perpetrated the evils giving rise to the initial legislative concern." 330 F.2d at 835.

The Court went on to explain that the Gambling Devices Act of 1962 attempted to remedy the problem arising from the use of non-coin operated machines that do not pay off directly *or* indirectly.

Accepting, as we must, the reasoning of the Court in *Clerk v. Chesapeake Beach Park, supra*, it then becomes apparent that § 264B attempted to cure the same evils as

---

9. It is difficult to decide whether gambling is a way of getting something for nothing or nothing for something. Attributed to Jim Oigan, *see* n. 1., *Lamb v. Northwestern Nat. Life Ins. Co.*, 56 Md.App. 125, 126, 467 A.2d 182 (1983).

those treated in the Federal Gambling Devices Act of 1962. We are compelled to conclude that it matters not one whit whether the pay off on a machine is released directly from the device itself into a coin tray, or whether an attendant electronically or mechanically "erases" the tallied free plays from the machine, and then compensates the player with money or something "representative of and convertible into money," such as tokens or coupons that are redeemable for merchandise.

"If the phrase defining material reward of the winner is read as money, coin, token or other object 'representative of *or* convertible into money,' as we shall hold it to be, it is apparent that not only the tokens which fall to a winner in the cup of the one-arm bandit but the aggregate value of the free plays won on the console or pinball machine, whether evidenced by a receipt or not, are alike 'representative of' money in that under the evidence they can be used to purchase beverages, food or merchandise of a specified dollar value. Chapter 617 [art. 27, § 264B] proscribes machines or devices through the operation of which this result can occur by chance." 251 Md. at 668–69, 248 A.2d 479.

A distillation of *Chesapeake Beach Park* and the Emory Commission Report leads to the conclusion that the classification of a device as illegal under § 264B depends on its potential for valuation of aggregated free plays "won" on a game of chance.[10]

The existence of the so-called knock-off switch is not determinative of whether a device is classified as an illegal slot machine under § 264B. Knock-off switches are usable for purposes other than gambling. If, for instance, a player after accumulating a great number of "free plays" becomes bored with the game, or for any other reason walks away

---

**10.** The Emory Commission reported that, "If the machine has an odds mechanism, provision for releasing free plays, and a meter for recording free plays released, it is a gambling machine," used as a "game of chance."

from the machine, it is unreasonable to expect the merchant to allow other persons to utilize the accumulated "free plays." The owner should have some way of removing the "free plays" from the machine, hence the knock-off switch. The knock-off meter, on the other hand, may be indicative that the machine is a gambling device. The knock-off meter is, in effect, an accounting of the "free plays" and may disclose to the owner of the machine that the degree of difficulty in "winning" is too great or too little.

■ When a device contains an odds mechanism, a method of releasing free plays, and a knock-off meter, the potential for valuating aggregate free plays exists and the machine is illegal under § 264B.[11]

### Antique Slot Machine Exemption

The General Assembly in Laws 1981, ch. 280, added subsection V to Md.Ann.Code art. 27, § 264B. That subsection, which was effective July 1, 1981, provided:

"V. It shall be a defense to any prosecution under paragraph III [12] of this section if the defendant shows that the slot machine is an antique slot machine and was not operated for gambling purposes while in the defendant's possession. For the purposes of this paragraph, a slot machine is an antique slot machine if the defendant shows by a preponderance of the evidence that it was manufactured prior to 1941. Whenever this defense is offered, no slot machine seized from any defendant shall

---

**11.** The legislature expressly said in § 2 of Laws 1963, ch. 617 that the act did not apply to "'pinball machines' so long as said machine, apparatus or device does not permit any compensation, remuneration, recompense, reward, repayment or winnings beyond an automatic replay of a game or games mechanically provided upon said machine." Section 2 has never been codified.

**12.** Paragraph III of § 264B states that, "Any firm, person or corporation violating the provisions hereof shall be deemed guilty of a misdemeanor and shall, upon conviction, be punishable by a fine of one thousand dollars ($1,000) or by imprisonment for a period not to exceed one (1) year, or by both such fine and imprisonment, for each such violation."

be destroyed or otherwise altered until after a final court determination including review upon appeal, if any, that the defense is not applicable. If the defense is applicable, the slot machine shall be returned pursuant to provisions of law providing for the return of property." [13]

Although the devices in the instant case were seized on December 30, 1980, six months prior to the effective date of subsection V of § 264B, the State did not begin forfeiture proceedings until October 13, 1981. Patently, that date is seventy-three days after subsection V became operative. The State contends that notwithstanding the fact that subsection V exempts antique slot machines, the exemption is not applicable retroactively. To bolster its position the State points to Md.Ann.Code art. 1, § 3, which provides:

"The repeal, or the repeal and reenactment, or the revision, amendment or consolidation of any statute, or of any section or part of a section of any statute, civil or criminal, shall not have the effect to release, extinguish, alter, modify or change, in whole or in part, any penalty, forfeiture or liability, either civil or criminal, which shall have been incurred under such statute, section or part thereof, unless the repealing, repealing and reenacting, revising amending or consolidating act shall expressly so provide; and such statute, section or part thereof, so

---

**13.** Subsection V was amended by Laws 1983, ch. 540. The amendment changed the date from which an "antique" is to be determined. The amended section reads:

"It shall be a defense to any prosecution under paragraph III of this section if the defendant shows that the slot machine is an antique slot machine and was not operated for gambling purposes while in the defendant's possession. For the purposes of this paragraph, a slot machine is an antique slot machine if the defendant shows by a preponderance of the evidence that the machine was manufactured at least *25 years* before the date on which the machine is seized. Whenever this defense is offered, no slot machine seized from any defendant shall be destroyed or otherwise altered until after a final court determination including review upon appeal, if any, that the defense is not applicable. If the defense is applicable, the slot machine shall be returned pursuant to provisions of law providing for the return of property." (Emphasis supplied.)

repealed, repealed and reenacted, revised, amended or
consolidated, shall be treated and held as still remaining
in force for the purpose of sustaining any and all proper
actions, suits, proceedings or prosecutions, civil or crimi-
nal, for the enforcement of such penalty, forfeiture or
liability, as well as for the purpose of sustaining any
judgment, decree or order which can or may be rendered,
entered or made in such actions, suits, proceedings or
prosecutions imposing, inflicting or declaring such penal-
ty, forfeiture or liability."

The State's position contains two flaws: 1) it ignores the
proposition that forfeiture statutes are generally construed,
where construction is possible, against forfeiture; and 2)
art. 1, § 3, does not provide that forfeiture relate to the
time when the devices were seized, but to the time when the
forfeiture proceeding was instituted. Had the State com-
menced its *in rem* action against the devices before July 1,
1981, its argument may have been persuasive, but that is
not the case. The State, for whatever reason, opted not to
proceed against the devices until after they had been first
wrapped in a garb of statutory protection.

 We read art. 27, § 264B, subsection V, and art. 1,
§ 3, together to provide that the exemption created by
subsection V applies to those cases in which a forfeiture
action is instituted on or after July 1, 1981, irrespective of
when the devices were seized.

### Inoperable Slot Machines

This Court in *Allen v. State*, 18 Md.App. 459, 307 A.2d
493, 498 (1973), reversed a conviction for possession of slot
machines wherein the evidence established that Allen had
possessed two "inoperable, console-type slot machines."
The trial court reasoned that § 264B did not provide that
the machines had to be in working condition in order for
them to be a violation, and inasmuch as they were *adapta-
ble* as slot machines, they were within the ambit of the
prohibition. Judge Scanlan, speaking for the Court, said:

"[A]t the time the Emory Commission called the Maryland General Assembly's attention to the corresponding New York anti-slot machine statute,[14] the later law contained provisions which prohibited not only the possession of devices which were 'adapted' for use as slot machines but also expressly barred those apparatuses which 'may be readily converted into one that is adapted' for such use. Our Legislature, however, did not elect to use the broader language of the New York statute when it authored and approved the bill which became Article 27, Section 264B. Under the circumstances, it would be an extension of our function for this Court to supply ... such a significant omission from the language of the statute." 18 Md.App. at 467, 307 A.2d 493.

The Court concluded by observing that, "[i]f the Legislature should be of the view that its original purpose in enacting Section 264B was to afford the statute a broader sweep than we allow it in this case the remedy is simple. It can amend the statute ... to outlaw not only devices which are 'adapted' for use as slot machines, but to prohibit those which are readily 'adaptable' for such use." *Allen v. State*, 18 Md.App. at 471, 307 A.2d 493.

In the years that have elapsed since *Allen v. State* was decided, the legislature has convened at least twelve times, but it has not changed § 264B, except to add and then amend subsection V. *Allen* makes clear that machines that are "adaptable" for use as slot machines are not within the scope of § 264B. *Allen* manifests, however, that those machines that are "adapted" for use as slot machines do fall within the range of the statutorily proscribed activity.

In his "Memorandum and Decree," the chancellor said:

---

**14.** The New York statute defined slot machines as follows: "Any machine, apparatus or device is a slot machine or device within the provisions of this section if it is one that is adapted, *or may readily be converted into one that is adapted,* for use in such a way ...." (Emphasis supplied.) *Allen v. State,* 18 Md.App. at 466, 307 A.2d 493.

"State's Exhibit No. 11, which is the inoperable Bally slot machine and all similarly inoperable devices are not statutory slot machines under Section 264B. Inoperable slot machines and parts adaptable for slot machines are not slot machines under the law. *Allen, supra* at 471 [307 A.2d 493]. However, partially dismantled slot machines are illegal devices and forfeited. *Allen, supra* at 470 [307 A.2d 493]."

■ The judge has correctly stated the test, but he has not applied it to any machine except the Bally slot machine. We, therefore, remand the matter to the trial court for a specific finding as to which machines are forfeitable and which are not.

### Delegation of Judicial Authority

Penultimately, Willow asserts that the chancellor improvidently delegated its forfeiture powers to the State. At trial the State introduced eleven devices as being representative of the 158 it seized from Willow. The trial judge, in his "Memorandum and Decree," wrote: "State's Exhibit No. 8 ... and other devices with provisions to facilitate house payments are forfeited as slot machines; State's Exhibit No. 3 ... and all similar free play devices are not slot machines." Defense counsel contends that phrases such as this delegate too much discretion to the State. Under the circuit court's order, the State and not the court will determine which of the devices are "similar" and which have provisions that facilitate house payments and hence are forfeitable.

In substance what the judge has done is to find one machine to be forfeitable and to delegate to the State the responsibility of determining which, if any, other machines are "similar" and thus forfeitable.

■ The 158 gaming devices that the State seized are not fungible goods from which a sample could be arbitrarily selected with the knowledge that one is identical to all. It was the obligation of the State to prove by competent

evidence that the devices were subject to forfeiture. While the State's witness testified that he brought to the court machines that were "representative" in his view of the total lot, he admits that he could not say they were identical to those not displayed to the court.

We shall remand with instructions that the State show, by a preponderance of the evidence, that each of the devices seized violates § 264B.

### Seizure and Confiscation of Cash

Ultimately, Willow claims that money seized by the State was not subject to forfeiture. Willow contends that the money was not seized "in connection with any arrest for the *playing or operation* of ... any ... gaming device unlawful under ... Md.Code, art. 27, § 264(a)." (Emphasis supplied.) Once this burden is met by the State, the money becomes *prima facie* contraband, and "[u]ntil evidence is presented to rebut this statutory inference, it is illegal for anyone other than the seizing authority to possess the money." *Cole v. State*, 296 Md. 607, 628, 465 A.2d 450 (1983).

The money in the case *sub judice* was seized from an office of Willow Enterprises. Counsel for Willow avers, and the State does not disagree, that "the money ... was seized from an office across the street from a commercial warehouse where the ... devices were being stored." That fact alone is insufficient to rebut the presumption that the money originated from the operation of a business that was in violation of the gambling laws. There was, however, no evidence that the money was used in the "playing or operation of ... [a] gaming device" as we read Md.Ann.Code art. 27, § 264(a). That section provides:

"(a) Whenever any money, currency, or cash is seized or captured by any police officer in this State in connection with any arrest for the playing or operation of any bookmaking, betting and wagering on horses or athletic events, or any lottery, game, table, or gaming device

unlawful under the provisions of this article, all such money, currency, or cash shall be deemed prima facie to be contraband of law as a gambling device or as a part of a gambling operation. All rights, title, and interest in and to such money, currency, or cash seized by the police of the local government shall immediately vest in and to the local governments of the county, municipality, or Baltimore City, or if seized by State authorities, to the State, and no such money, currency, or cash shall be returned to any person claiming the same, or to any other person, except as provided in this section. The Baltimore City police department is not a State authority for the purposes of this section."

We think § 264(a) to be directed to a seizure of money at a place where gambling is occurring and not to a seizure at a place where gaming devices are stored, repaired, refitted, refurbished or offered for sale. The seizure is aimed at confiscating money used in gaming and not money received in the operation of a business engaged in storing or selling such devices.

Inasmuch as the forfeiture of the cash was error, we shall reverse that portion of the order and direct that the $9,809.00 be returned to Willow.

## Summary

We herein hold that gaming devices are not contraband *per se*. Whether a device is derivative contraband requires a judicial determination before there may be forfeiture.

There was no statutory authority in this State to seize the 158 purported gaming devices from Willow Enterprises, Inc. The State did, however, have the common law right to require forfeiture of contraband. Slot machines are contraband, and thus the State has the right to such forfeiture.

The trial court correctly decided that the statutory exception allowed to possessors of antique slot machines was applicable to Willow, notwithstanding that the machines were seized six months before the statute became effective.

We look to the date the forfeiture action was begun, rather than the date of seizure.

The trial court impermissibly delegated to the State the task of determining which of the seized non-fungible machines, other than those introduced into evidence, violated § 264B. It is for the court to make the determination. On rehearing, photographic evidence may be offered in lieu of the actual physical production of the gaming devices.

The $9,809.00 in cash seized by the police from Willow is not contraband, because it was not "seized or captured by any police officer in connection with any arrest for the playing or operation of any ... gaming devices." It is to be returned to Willow.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED FOR FURTHER PROCEEDING CONSISTENT HEREWITH.

COSTS TO BE DIVIDED EQUALLY BETWEEN ANNE ARUNDEL COUNTY AND APPELLEE.