499 A.2d 940

**STATE of Maryland**

**v.**

**ONE HUNDRED AND FIFTY-EIGHT GAMING DEVICES.**

**No. 106 Sept. Term, 1984.**

Court of Appeals of Maryland.

Nov. 7, 1985.

Avery Aisenstark, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Lynette M. Phillips, Asst. Atty. Gen., on brief), Baltimore, for appellant.

Thomas C. Morrow (William K. Meyer, Francis B. Burch and Joseph C. Jacobs, on brief), Baltimore, for appellee.

Before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), specially assigned.

MURPHY, Chief Judge.

This case involves a number of devices seized as illegal "slot machines" under the provisions of ch. 617 of the Acts of 1963, as amended by ch. 280 of the Acts of 1981, now codified as Maryland Code (1982 Repl.Vol.), Article 27, § 264B.

## I

Section 264B makes it a criminal offense after a date not here relevant "to locate, possess, keep, maintain or operate any slot machine within this State." The statute defines a "slot machine" as:

"Any machine, apparatus or device ... that is adapted for use in such a way that, as a result of the insertion or deposit therein, or placing with another person of any piece of money, coin, token or other object, such machine, apparatus or device is caused to operate or may be operated, and by reason of any element of chance or of other outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, coin, token or other object representative of and convertible into money, irrespective of whether the

said machine, apparatus or device may, apart from any element of chance or unpredictable outcome of such operation, also sell, deliver or present some merchandise or money or other tangible thing of value."

Ch. 617 of the Acts of 1963—the original enactment prohibiting slot machines in Maryland—contained the following uncodified provision as § 2 of the Act:

"[T]he intent of the legislature in the enactment of the aforegoing act is expressed as not intending to apply to the machine, apparatus or device commonly known or colloquially referred to, as 'pinball machine,' so long as said machine, apparatus or device does not permit any compensation, remuneration, recompense, reward, repayment or winnings beyond an automatic replay of a game or games mechanically provided upon said machine."

Paragraph V of § 264B, as originally enacted by ch. 280 of the Acts of 1981, made special provision for "antique" slot machines as follows:

"It shall be a defense to any prosecution under paragraph III of this section if the defendant shows that the slot machine is an antique slot machine and was not operated for gambling purposes while in the defendant's possession. For the purposes of this paragraph, a slot machine is an antique slot machine if the defendant shows by a preponderance of the evidence that it was manufactured prior to 1941. Whenever this defense is offered, no slot machine seized from any defendant shall be destroyed or otherwise altered until after a final court determination including review upon appeal, if any, that the defense is not applicable. If the defense is applicable, the slot machine shall be returned pursuant to provisions of law providing for the return of property." [1]

---

1. Ch. 540 of the Acts of 1983 amended this provision to change "it was manufactured prior to 1941" to "the machine was manufactured at least 25 years before the date on which the machine is seized."

## II

The State seized the devices in question on December 30, 1980 from the commercial warehouse premises of Willow Enterprises, Inc. Willow's president, Louis Wilner, was convicted of unlawfully possessing slot machines in violation of § 264B. He did not appeal.

On October 13, 1981, the State initiated an *in rem* proceeding in the Circuit Court for Anne Arundel County for forfeiture of the seized devices. At trial, the State introduced a number of devices, which it claimed were representative of all of the devices that had been seized. The circuit court (Wray, J.) in a memorandum opinion found that certain of the devices, *e.g.*, the Sircoma Draw 80 Poker machines equipped with a "knock-off" switch or meter, were illegal slot machines because they were "presently adapted to register rewards obtained by chance and to facilitate undetectable human payoffs of items with value." The court also found that other devices [2] "with payoffs other than free plays" were illegal slot machines subject to forfeiture. Another device found by the trial court to be an illegal slot machine was a so-called Delta Red, White and Blue machine "with the knockoff switch and other devices with provisions to facilitate house payments." Moreover, the court declared a number of console machines to be illegal slot machines.[3] It found, however, that a Delta machine "without a knockoff switch," as well as all similar free-play devices, was not a slot machine under the statutory definition. The court held that an inoperable Bally slot machine (a conventional "one-arm bandit"), as well as all like inoperable devices and parts adaptable for slot machine usage, was not a slot machine within the contemplation of the statute. It also held that a number of partially dismantled devices met the definition of a slot machine and were

---

**2.** These devices were variously known as Dawg Race, Black Jack, Forbes, Micro and Vega 21.

**3.** These devices were known variously as Sweet Shawnee, Black Dragon, Two Knights, King's Wild Arm and Wild Red.

subject to forfeiture. Finally, the court concluded that a number of other devices manufactured prior to 1941, and not operated for gambling purposes while in the owner's possession, were not subject to forfeiture because such devices were "antique" slot machines exempt under § 264B(V).

The State appealed. It claimed that the trial court erred in not finding the inoperable devices and the free-play devices without knock-off switches or meters to be illegal slot machines and in ordering the return of the "antique" slot machines. Willow cross-appealed. It contended, among other things, that the trial court misconstrued § 264B in not exempting all free-play devices from the statutory definition of a slot machine.

The Court of Special Appeals decided the cross-appeals in *State v. 158 Gaming Devices,* 59 Md.App. 44, 474 A.2d 545 (1984). It first noted that the seized devices were of various makes, models and designs, describing them as follows:

"[M]ost of the seized devices incorporated 'free play' or 'game credit' features that rewarded the successful player with 'free' replays, which were registered on a three or four digit meter attached to the machine. The player was able to use the free plays by activating a 'play' button on the machine.

"Many of the alleged gaming devices were adapted with a 'knock-off switch' and a 'knock-off meter.' The switch and meter enabled the machine owner to remove game credits from the machine while maintaining a tabulation of the total free plays actually won. A number of the seized devices had not yet been fitted with the knock-off switches or meters, but unattached meters were found at Willow's premises.

"Forty-eight of the devices seized were Delta 'Red, White and Blue' machines that issue stamps printed with randomly selected numbers. If the numbers on the stamps issued by the machine correspond with numbers

on a chart that was placed on top of the machine, the player wins replays, coupons or merchandise.

"The remaining devices were a variety of 'one-arm bandits' which are activated by a player's depositing a coin in a slot and pulling a handle. The handle rotates reels which spin and then stop, revealing a combination of symbols, numbers, words or colors. If the combination of the reels corresponds with one of the predetermined winning combinations, the machine releases the 'payoff' into a coin tray located on the lower front of the machine. With the exception of the one-arm bandit devices, none of the gaming machines had the capability of directly paying off to the player. The other devices required a third party to redeem 'free games' for something of value that was more tangible." 59 Md.App. at 48–49, 474 A.2d 545 (footnote omitted).

In considering the State's right to institute forfeiture proceedings against the seized devices, the court concluded that property which is subject to forfeiture is characterized as either contraband per se or derivative contraband. The former, the court said, is property that is inherently illegal while derivative contraband is property that may be legal or illegal to possess, depending upon the circumstances. 59 Md.App. at 50, 474 A.2d 545. The court opined that the devices seized from Willow "may or may not have a lawful, useful purpose" and were therefore not contraband per se. *Id.* It determined, however, that the devices would be forfeitable as derivative contraband under common law principles if the State showed by a preponderance of the evidence "that the owner or user of the seized items intended the property to be used illegally and that the items were procured, held or used for an unlawful purpose." *Id.* at 53, 474 A.2d 545.

After reviewing the legislative history underlying the enactment of § 264B and our decision in *Clerk v. Chesapeake Beach Park*, 251 Md. 657, 248 A.2d 479 (1968), the court held:

"[T]he classification of a device as illegal under § 264B depends on its potential for valuation of aggregated free plays 'won' on a game of chance." 59 Md.App. at 57, 474 A.2d 545 (footnote omitted).

It said that the existence of the so-called knock-off switch was not "determinative of whether a device is classified as an illegal slot machine under § 264B." *Id.* Explaining, the court said:

"Knock-off switches are usable for purposes other than gambling. If, for instance, a player after accumulating a great number of 'free plays' becomes bored with the game, or for any other reason walks away from the machine, it is unreasonable to expect the merchant to allow other persons to utilize the accumulated 'free plays.' The owner should have some way of removing the 'free plays' from the machine, hence the knock-off switch. The knock-off meter, on the other hand, may be indicative that the machine is a gambling device. The knock-off meter is, in effect, an accounting of the 'free plays' and may disclose to the owner of the machine that the degree of difficulty in 'winning' is too great or too little.

"When a device contains an odds mechanism, a method of releasing free plays, and a knock-off meter, the potential for valuating aggregate free plays exists and the machine is illegal under § 264B." *Id.* at 57–58, 474 A.2d 545 (footnote omitted).

The Court of Special Appeals also determined that certain of the devices seized, having been manufactured prior to 1941, were antique slot machines exempt from seizure under § 264B(V); that a number of inoperable devices, which were merely adaptable, but not actually adapted for use as slot machines, were not within the statutory definition; but that partially dismantled devices meeting the statutory definition were illegal slot machines and, therefore, subject to forfeiture. The court remanded the case to the trial court for the entry of an order consistent with the principles set forth in its opinion.

The State's petition for certiorari, which we granted, raised two questions:

(1) Whether a gambling device that meets the statutory definition of "slot machine"—and, as such, is subject to an unqualified statutory prohibition against its possession for any reason is contraband per se; and

(2) Whether a gambling device that operates on principles of consideration, chance, and reward as specified in the governing statutory prohibition nevertheless does not violate the statute absent the existence of certain additional mechanisms.

Willow did not file a cross-petition for certiorari.

### III

Placing reliance upon the legislative history of § 264B, the State contends that the mere possession of slot machines prohibited by the statute is illegal, whatever the circumstances of their use or intended use, and because such devices cannot be used for any legitimate purpose, they are subject to summary forfeiture as contraband per se. The State claims that a device, other than a true free-play pinball machine, is illegal under the Act if it (1) requires consideration such as money or a token to operate; (2) operates by reason of any element of chance; and (3) entitles the player to receive a reward, whether monetary or representative of or convertible into money, such as free plays. This is so, the State maintains, without regard to the device's mechanical, technological or stylistic design features. Accordingly, the State concludes that the Court of Special Appeals erroneously distinguished between legal gaming devices and illegal slot machines—not on the basis of whether the devices operated on the § 264B principles of consideration, chance and reward—but rather on the presence of various features, such as odds mechanisms, knock-off switches and meters, that are nowhere referred to in the statute.

The State says that the devices in question are activated either directly or indirectly by the insertion of coins or some other payment of consideration and operate exclusively on the principle of chance. As to the latter element, the State maintains that an individual's skill is totally irrelevant to the game's outcome, unlike some video arcade games such as pac-man and some pinball machines, where manipulation of levers, buttons or control sticks enables a skillful player to win free games.

The last element—the concept of a reward representative of or convertible into money—is also present, the State claims, because each of the seized devices offers some form of remuneration to the player, either by means of a coin chute, a redeemable token or game credits that can be used for further games or clandestinely converted into cash.[4]

The State argues that, under Maryland case law, free games constitute a "thing of value," representative of or convertible into money within the contemplation of § 264B. It contends that the legislature did not intend to restrict the reward element of § 264B only to devices that offer some tangible object of value; otherwise, the express exemption for free play pinball machines would not be necessary. That free plays have intrinsic value, according to the State, is evident from the fact that the proprietor is manifestly concerned with the number of free plays won since the player may continue to operate the device without paying— to the proprietor's obvious financial detriment. The State sees free plays as the functional equivalent of the "coin, token or other object" otherwise necessary under § 264B to activate the machine or the mechanical payoff chute. As none of the seized devices were free play pinball machines, the State urges that the statutory exemption for such devices is plainly inapplicable.

---

**4.** Evidence in the record before us shows that, in practice, accumulated game credits frequently result in cash payoffs to the successful player. That knock-off switches and meters are designed to facilitate cash payoffs is also shown by the evidence.

Willow acknowledges that the seized devices are coin activated and operate on the basis of chance. It says that the main issue is simply whether a free play itself is a thing of value within the ambit of § 264B. If it is, Willow concedes that the devices are illegal slot machines and subject to summary forfeiture as contraband per se. Willow contends, however, that a free play is not a thing of value under Maryland law and that consequently § 264B does not prohibit *any* free-play devices. The exemption in § 264B for free-play pinball machines, according to Willow, encompasses any and all free-play devices and not just pinball machines. Willow acknowledges, however, that devices which operate on the principles of consideration and chance and which reward a successful player with free plays may be illegal under § 264B if the devices possess features designed to promote and facilitate gambling, and free plays are redeemable for value. Willow thus appears to have accepted the intermediate appellate court's determination, from which it did not appeal, that devices equipped with odds mechanisms, knock-off switches and meters are illegal slot machines under § 264B.

## IV

In determining the intention of the legislature in enacting § 264B, the most frequently used document is the Report of the Slot Machine Study Committee appointed by Governor Tawes in 1962, sometimes referred to as the Emory Commission after its chairman, Richard W. Emory. The committee in a report to the Governor, dated January 12, 1963, noted that its study encompassed all gambling devices and machines which have been legalized by local law. It reviewed the history of pinball and other coin-operated devices in Maryland. It observed that the provisions of ch. 11 of the Acts of 1937 (Extraordinary Session) permitted the issuance of a statewide license for a "pin ball machine or game played with balls and plungers ... or any other machine or device so constructed or devised to make the result of the operation depend in whole or in part upon the

skill of the player. . . ." This law authorized "playing for a premium, trophy or prize, in merchandise only, for high score or skill in the operation thereof." According to the committee report, ch. 11 was a Depression era revenue raising measure. It was repealed by ch. 8 of the Acts of 1939. The report next pointed out that the legislature, at its 1939 session, refused to enact another statewide licensing law for "pinball and other coin operated machines." It did, however, pass local laws for Anne Arundel, Charles, Montgomery and Prince George's Counties. These measures, however, were vetoed by then Governor O'Conor. In 1941, pinball and slot machine laws were passed in Anne Arundel and Garrett Counties but were again vetoed by the Governor. Public local laws legalizing slot machines were subsequently enacted for Anne Arundel County (ch. 321 of the Acts of 1943), Calvert County (ch. 13 of the Acts of 1948, Extraordinary Session), Charles County (ch. 678 of the Acts of 1949) and St. Mary's County (ch. 32 of the Acts of 1947, Extraordinary Session). In Calvert, Charles and St. Mary's Counties, the legalized devices consisted of any "mechanical or electrical amusement devices which require the insertion of a coin or token for their operation and which offer an award ... based in whole or in part upon chance or [the operator's] skill." In Anne Arundel County, any "amusement device" was legalized, as well as commercial bingo.[5] The public local law applicable to each of these Southern Maryland counties exempted the legalized devices from the State's gambling laws.

The committee noted that the Federal Gambling Devices Act of 1962 (15 U.S.C. §§ 1171–1177), amending the Johnson Act of 1951, enlarged the definition of gambling devices to include "free-play" slot machines. The need for this legislation was set forth in a congressional report, quoted in the Emory Commission Report (p. 10), as follows:

" 'New gambling machines have been developed which are controlled by syndicated crime, but which are not

---

5. As to bingo, *see* ch. 625 of the Acts of 1949.

subject to the provisions of the Johnson Act because they are not coin-operated, do not pay off directly or indirectly, and do not have a drum or reel as in the conventional slot machine. Principally they are pinball machines which afford players an opportunity if certain combinations are achieved to register a great number of free games, in some instances up to 999 free games. These machines usually have a mechanism whereby the player can change the odds merely by inserting more money into the machine or increase the number of balls that can be played by inserting more money. These free games can be played off or they can be eliminated from the machine by pressing a button or lever. The number of accumulated free games eliminated from the machine are recorded by a meter and payment to the player for the number of free games canceled is made by the proprietor of the establishment where the gambling machine is located or by his agent.

" 'The committee bill broadens the definition of the term "gambling device" in the Johnson Act so as to include such pinball machines and any other mechanical devices which are designed and manufactured primarily for use in connection with gambling and which when operated may deliver as a result of the application of an element of chance any money or property, either directly or indirectly.

" 'Pinball and other machines, intended for amusement only, which award a limited number of free plays that are not convertible to money or other things of value, are not covered by this legislation.' "

The committee report observed that the 1962 Federal Act "makes the possession of any machine which may be used as a gambling device illegal without requiring proof of cash pay-offs." Among several exceptions was one for a "marble machine (a so-called pinball machine) . . . which is not designed and manufactured primarily for use in connection with gambling, and (A) which when operated does not deliver as a result of the application of an element of

chance, any money or property or (B) by the operation of which a person may not become entitled to receive, as the result of the application of an element of chance, any money or property."

In its report, the Emory Commission noted a distinction between "free-play" gambling devices and "free-play" amusement devices, stating that the former required a $250 annual tax stamp while the latter required only a $10 annual tax stamp. According to the committee report, the difference between the two types of machines resided in their construction and operation. It said (at p. 11):

"If the machine has an odds mechanism, provision for releasing free plays and a meter for recording free plays released, then it is a gambling device. If the machine does not have such gambling features, its use for gambling is not considered practicable even though it may award free games in a limited number."

In this regard, the committee report referred to federal tax regulations, describing a "free play" gambling device required to have a $250 gambling tax stamp, as follows (p. 12):

" 'A machine which is operated by means of the insertion of a coin, token, or similar object and which, even though it does not dispense cash or tokens, has the features and characteristics of a gaming device whether or not evidence exists as to actual payoffs.

" 'A pinball machine equipped with a push button for releasing free plays and a meter for recording the plays so released, or equipped with provisions for multiple coin insertion for increasing the odds.' "

In the course of its report, the committee noted that, in addition to the statutes in Anne Arundel, Calvert, Charles and St. Mary's Counties, laws existed licensing "free-play" pinball and console machines in Baltimore City and ten

other counties.[6] These laws, the committee reported, made no distinction between the free-play machines classified by the federal government as gambling devices and amusement-type free-play machines. The committee report, referring to testimony before various congressional committees, concluded at p. 12 "that there are more slot machines including the 'free play' gambling devices licensed with the Federal government in Maryland than in any other State in the entire United States." The committee said (p. 12) that slot machines are not limited to four Southern Maryland counties. It cited statistics showing that in Baltimore City and Baltimore County alone, there were "free play" gambling devices at 2,700 different locations in 1962, and that in the fiscal year ended June 30, 1962, there were 3,971 applications for federal gambling stamps in Maryland over and above 850 slot machine locations in the four Southern Maryland counties. But the committee said that it was unable to determine the extent to which, in Maryland, the devices classified as gambling devices under the federal law were used for gambling. It noted, however, that by enactment of the Federal Gambling Devices Act of 1962, the Congress established as national policy "the fact that these 'free play' slot machines are gambling devices and should be outlawed" as they are used "extensively for gambling on a far larger scale than legalized slot machines." Report, at 13–14. The committee concluded its report as follows (p. 14):

"Any abolition of slot machines requires repeal of the local laws applicable to Anne Arundel, Calvert, Charles and St. Mary's Counties legalizing cash pay-off machines. It also requires repeal or amendment of the General Laws permitting the licensing of 'free play' slot machines classified by the Federal government as gambling devices, and enactment of a State law at least as strong as the Federal

---

6. *See* Maryland Code (1957, 1962 Cum.Supp.), Art. 56, §§ 18, 19, 20 and 20A. The subdivisions then were Baltimore City and Baltimore, Caroline, Dorchester, Harford, Kent, Queen Anne's, Talbot, Washington, Wicomico and Worcester Counties.

Gambling Devices Act of 1962 prohibiting any machine, 'free play' or otherwise, which may be used as a gambling device. Unless the problem is attacked on a state wide basis, the 'free play' gambling devices will invade Southern Maryland and the slot machine business will continue there, but the four Counties will have been deprived of the approximate $1,600,000 in annual revenues which they now enjoy.

"Florida and New York have laws that prohibit the possession of any machine or device which, by reason of any element of chance or of other outcome of such operation unpredictable by the operator, the user may receive or become entitled to receive anything of value or otherwise or may secure additional chances or rights to use the machine. It will be noted that this is a very broad definition which prohibits the possession of even a 'free play' machine which the Federal government in the Gambling Devices Act of 1962 and in the revenue laws classifies as an amusement device."

The committee declined to recommend "[w]hether Maryland [should] adop[t] a law based upon Florida and New York law or upon Federal law...." It was thus for the General Assembly to delineate the devices to be encompassed by any new legislation and it responded by the 1963 enactment of § 264B.

## V

The most authoritative interpretation of § 264B is found in *Clerk v. Chesapeake Beach Park,* 251 Md. 657, 248 A.2d 479 (1968). That case involved a declaratory judgment action to determine whether an electrical console device and a partly mechanical and partly electrical pinball machine were illegal slot machines under § 264B. Both machines required the insertion of a coin for their operation and offered an award to the operator based in whole or in part, as to the console machine, on chance and, as to the pinball device, upon chance or skill. The award offered by each

device was " 'the registration upon the device of one or more free plays which may, in the option of the operator, be taken by replaying the machine or may be redeemed ... for merchandise.' " *Id.* at 659, 248 A.2d 479. A declaration that the devices were legal under the public local laws of Calvert County which licensed "amusement devices" was also sought.

We noted in *Chesapeake Beach* that our earlier decision in *Gaither v. Cate,* 156 Md. 254, 144 A. 239 (1929) held "in disagreement with various legislative and judicial holdings elsewhere to the contrary, that a machine *adapted for gambling* which ostensibly offered as a reward for playing it only additional free plays was a gambling device." *Id.* [251 Md.] at 664, 248 A.2d 479 (emphasis added). We also observed that the holding in *Gaither v. Cate* was influenced by the statutory provision in then Code, Art. 27, § 257 (now, Code, 1982 Repl.Vol., § 246 of Art. 27) requiring that courts construe the law " 'relating to gambling and betting liberally, so as to prevent the mischiefs intended to be provided against.' " *Id.*

After reviewing the report of the Emory Commission, the Court in *Chesapeake Beach* turned to the uncodified provision of § 264B which, as earlier indicated, expressly exempted devices "commonly known or colloquially referred to, as 'pinball machine' " from inclusion under the statutory definition of a slot machine, where such devices did not permit any reward "beyond an automatic replay of a game or games mechanically provided upon said machine." As to this, we said:

> "[T]he proper inference to be drawn from the inclusion of Section 2 in [ch. 617], legalizing *only* true free play pinball machines, is that the legislature believed the definition of a slot machine in [§ 264B] was broad enough to include, or to be construed as including, all machines or devices conferring upon a winning player any award, including true free play machines, as gambling devices

under *Gaither v. Cate, supra.*" *Id.* at 666, 248 A.2d 479 (emphasis in original).

We thereafter added:

"Another fair inference is that because the only deviation the legislature selected from the general definition was the true free play pinball machine, it regarded and intended to classify as slot machines any console and pinball machines that furnished gratification or reward to a winning player other than further free plays." *Id.* at 666, 248 A.2d 479.

We concluded that § 264B

"rejected the total ban of the New York and Florida statutes including even free play machines, and adopted the theory of the Federal statutes which classify as gambling devices pinball machines which can pay off in other than additional free plays but classify as permitted amusement devices free play pinball machines." *Id.* at 666, 248 A.2d 479.

We also held in *Chesapeake Beach* that, to satisfy the actual legislative intention, the phrase in § 264B—"representative of and convertible into money" meant representative of *or* convertible into money. *Id.* at 667, 248 A.2d 479. We said:

"If the phrase defining the material reward of the winner is read as money, coin, token or other object 'representative of or convertible into money,' as we hold it should be, it is apparent that not only the tokens which fall to a winner in the cup of the one-arm bandit but the aggregate value of the free plays won on the console or pinball machine, whether evidenced by a receipt or not, are alike 'representative of' money in that *under the evidence* they can be used to purchase beverages, food or merchandise of a specified dollar value. [Section 264B] proscribes machines or devices through the operation of which this result can occur by chance." *Id.* at 668–69, 248 A.2d 479 (emphasis added).

Finally, we said that § 264B repealed the local Calvert County law to the extent that it permitted the licensing, possession and operation of gambling machines and devices that come within the ban of the statewide Act. *Id.* at 669, 248 A.2d 479. As the free plays on both the console and pinball devices were redeemable for merchandise, we declared that they were in violation of § 264B.[7]

## VI

Made explicitly clear in *Chesapeake Beach* was that the General Assembly in enacting § 264B did not adopt either the Florida or New York statutes which declared a device to be an illegal slot machine simply because, *inter alia*, the successful player was rewarded by "additional chances or rights to use such ... device." [8] The omission of any such

---

**7.** The result reached in *Chesapeake·Beach* was applied under nearly identical facts to console and pinball devices licensed in Charles County. *See Charles Co. v. Conner,* 251 Md. 670, 248 A.2d 486 (1968).

**8.** The definition in the Florida statute, as enacted by ch. 18143, Acts of 1937, is as follows:

"Any machine or device is a slot machine or device within the provisions of this Act if it is one that is adapted, for use in such a way that, as a result of the insertion of any piece of money or coin or other object such machine or device is caused to operate or may be operated, and by reason of any element of chance or of other outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, credit, allowance or *thing of value,* or any check, slug, token or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance or thing of value, or which may be given in trade, or the user may secure additional chances or rights to use such machine, apparatus or device, even though it may, in addition to any element of chance or unpredictable outcome of such operation, also sell, deliver or present some merchandise, indication of weight, entertainment or other thing of value." (Emphasis supplied.)

New York Penal Law § 982(2), as enacted by ch. 317, Acts of 1937, reads:

"Any machine, apparatus or device is a slot machine or device within the provisions of this section if it is one that is adapted, or may readily be converted into one that is adapted, for use in such a way that, as a result of the insertion of any piece of money or coin or other object such machine or device is caused to operate or may be operated, and by reason of any element of chance or of other

language from § 264B is of obvious significance. Equally significant is the use in § 264B of the phrase, "any piece of money, coin, token or other object representative of [or] convertible into money" rather than the broader phrase in the Florida and New York statutes, "any piece of money, credit, allowance or other *thing of value,* or any check, slug, token or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance or thing of value." (Emphasis added.) Section 264B does not, in a similar context, contain the words "thing of value" which had frequently, although not invariably, been interpreted as encompassing a free play. *See* Annot., *Coin-operated pinball machine or similar device, played for amusement only or confining reward to privilege of free replays, as prohibited or permitted by antigambling laws,* 89 A.L.R.2d 815 (1963).

Moreover, as we recognized in *Chesapeake Beach,* the General Assembly, in enacting § 264B, "adopted the theory of the Federal statutes." 251 Md. at 666, 248 A.2d 479. We thereby expressly noted a distinction between devices constructed and designed for gambling which "pay off in other than additional free plays" and other devices, not adapted for gambling and used solely for amusement, which award free plays that are not redeemable for money or merchandise.

The verbiage used in § 264B must, of course, also be considered in light of the legislature's knowledge of the construction that the courts had previously given to the

---

outcome of such operation unpredictable by him, the user may receive or become entitled to receive any piece of money, credit, allowance or *thing of value,* or any check, slug, token or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance or thing of value, or which may be given in trade, or the user may secure additional chances or rights to use such machine, apparatus or device; irrespective of whether it may, apart from any element of chance or unpredictable outcome of such operation, also sell, deliver or present some merchandise, indication of weight, entertainment or other thing of value." (Emphasis supplied.)

State's gambling laws. *Gaither v. Cate, supra,* decided in 1929, involved a coin-operated slot machine which, upon activation by the insertion of a nickel and the pulling of a lever, simultaneously (a) dispensed a packet of mint wafers worth but a fraction of a nickel and (b) caused several cylinders containing various symbols to rotate and form various combinations, some of which entitled the successful player to receive tokens in varying amounts. Both the device and the tokens themselves specified that the game was for amusement only and that the tokens were not redeemable. The tokens could be used to replay the machine and also for insertion, albeit unlawfully, in pay telephones. In concluding that such machines were subject to seizure as illegal gambling devices, the court noted that in actuality the machines were "manufactured and designed for gambling purposes" to increase sales of mint wafers "by appealing to the gambling instinct, which is either active or latent in almost every individual." 156 Md. at 264–65, 144 A. 239. The attraction of the device, the Court said, was that the player, in addition to receiving mint wafers,

> "is furnished a certain varying amount of amusement in observing the revolving of the cylinders and the formation of different combinations of symbols thereon, or that [tokens] will be redeemed at a certain figure, or that he desires to use them for the fraudulent purpose of placing them in coin slot boxes in substitution for money." *Id.* at 266, 144 A. 239.

The Court characterized the device as an illegal "game of chance, exciting the gambling instinct." *Id.* at 266, 144 A. 239. It said that the amusement thereby provided was "a thing of value, for it is probably true that more money is spent each year by the citizens of this country for that purpose than for any other." *Id.* at 267, 144 A. 239. And, finally, the Court said that the amount of amusement

furnished varied as between players, depending entirely upon the element of chance.[9]

Of course, it has long violated Maryland's gambling laws to maintain a pinball machine which, in lieu of free games won, permits the payment of cash to the successful player. *See Hunter v. State*, 193 Md. 596, 69 A.2d 505 (1949). In *Bell v. Prince George's Co.*, 195 Md. 21, 72 A.2d 746 (1950), we recognized that coin-operated mechanical or electrical devices, ostensibly for amusement, have been utilized as gambling devices where free games won by the successful player were "paid off" in cash. *Brown v. State*, 210 Md. 301, 123 A.2d 324 (1956) was a gambling prosecution that involved a pinball machine capable of awarding a successful player up to 200 free games. The device contained a switch by which to remove free plays won by a successful operator. At his option, the player would be paid in cash for the free games. We there said that the inducement to play the device, in part at least, was the chance of gaining a monetary reward. We noted the existence of cases from other jurisdictions holding that an award of free games "is generally held to constitute a thing of value" under gambling laws and we observed that "[i]f a pinball machine is not a gambling device *per se*, it may become one when it is shown that it is in fact put to such use." *Id.* at 307–08, 123 A.2d 324.

The three elements of gambling—consideration, chance and reward [10]—are thus clearly present in a device which,

---

**9.** The merchandise-dispensing device in *Gaither* seems to be of a kind contemplated by the legislature when, in § 264B, it expressly included within the definition of a slot machine any coin-operated gambling device which "apart from any element of chance or unpredictable outcome of such operation, [may] also sell, deliver or present some merchandise or money or other tangible thing of value."

**10.** For cases defining the three elements of gambling, *see, e.g., State v. Pinball Machines*, 404 P.2d 923, 925 (Alaska 1965); *Farina v. Kelly*, 147 Conn. 444, 162 A.2d 517, 520 (1960); *Commonwealth v. Rivers*, 323 Mass. 379, 82 N.E.2d 216, 219 (1948); *Giomi v. Chase*, 47 N.M. 22, 132 P.2d 715, 716 (1942); *Kraus v. City of Cleveland*, 135 Ohio St. 43, 19 N.E.2d 159, 169 (1939); *Commonwealth v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973, 977 (1983); *Holliday v. Governor*

for a price, and based upon chance, offers a monetary or merchandise reward to the successful player. And, as earlier indicated, the award of a free game, without more, has in a number of jurisdictions, under statutes of varying import, been construed to constitute a reward in determining whether particular devices violated a state's gambling laws. *See Sinclair v. Benton,* 152 Fla. 138, 10 So.2d 917, 918 (1942) ("prize or reward"); *Heath Sales Co. v. Bloodworth,* 221 Ga. 567, 146 S.E.2d 275, 278 (1965) ("valuable thing"); *Territory v. Naumu,* 43 Hawaii 66, 68 (1958), *aff'd,* 273 F.2d 568 (9th Cir.1959) ("anything of value"); *Thamart v. Moline,* 66 Idaho 110, 156 P.2d 187 (1945) ("credit" and "representative of values"); *State v. Wiley,* 232 Iowa 443, 3 N.W.2d 620, 622–23 (1942) (general gambling statute prohibiting "machines used for gambling, or any slot machine or device with an element of chance attending such operation"); *Steely v. Commonwealth,* 291 Ky. 554, 164 S.W.2d 977, 978–80 (1942) ("thing"); *Baedaro v. Caldwell,* 156 Neb. 489, 56 N.W.2d 706, 710–11 (1953) ("property"); *Middlemas v. Strutz,* 71 N.D. 186, 299 N.W. 589 (1941) ("property"); *Westerhaus Co. v. Cincinnati,* 165 Ohio St. 327, 135 N.E.2d 318, 325–27 (1956) (statute prohibiting "gambling device or machine"); *State v. Sandfer,* 93 Okla.Crim. 228, 226 P.2d 438 (1951) ("property . . . or any other thing, tangible or intangible, except amusement or entertainment"); *Heartley v. State,* 178 Tenn. 254, 157 S.W.2d 1 (1941) ("other valuable thing"); *State v. One Slot Machine,* 305 S.W.2d 386 (Tex.Civ.App.1957) ("property"); *Hightower v. State,* 156 S.W.2d 327, 328 (Tex.Civ.App.1941) ("anything of value"); *State v. Lake Geneva Lanes, Inc.,* 22 Wis.2d 151, 125 N.W.2d 622 (1963) ("something of value"). None of these cases indicated whether the particular devices in question contained features indicative of a gambling machine, *e.g.,* odds mechanisms, knock-off switches and free-play recorder meters.

---

*of State of South Carolina,* 78 F.Supp. 918, 924–25 (W.D.S.Ca.1948), *aff'd,* 335 U.S. 803, 69 S.Ct. 56, 93 L.Ed. 360 (1948).

In a number of other cases that have held a free play to be a reward, the devices contained various indicia of gambling. *See State v. Pinball Machines,* 404 P.2d 923 (Alaska 1965) (multiple-coin device, search relay, 999 free games, knock-off button, and knock-off meter); *Farina v. Kelly,* 147 Conn. 444, 162 A.2d 517 (1960) (statute prohibiting "slot machine . . . used or designed for the purpose of a lottery or gaming") (multiple-coin device, 600 free games, payoff adjustment, and tilt mechanism); *Vaughan v. Dowling,* 243 La. 390, 144 So.2d 371 (1962) ("anything of value") (multiple-coin device, 999 free games, knock-off button, lack of skill, and convertibility to direct payout); *Commonwealth v. Rivers,* 323 Mass. 379, 82 N.E.2d 216 (1948) ("property of value") (multiple-coin device, 500 free plays, knock-off button, knock-off meter, and convertibility to direct payout); *Giomi v. Chase,* 47 N.M. 22, 132 P.2d 715 (1942) ("anything of value") (knock-off button); *Alexander v. Martin,* 192 S.C. 176, 6 S.E.2d 20 (1939) (statute prohibiting "devices pertaining to games of chance . . . except . . . [those] constructed as to give a certain uniform and fair return in value . . . and in which there is no element of chance") (payoffs on similar machines); *State v. Bally Beach Club Pinball Machine,* 119 Vt. 123, 119 A.2d 876 (1956) ("thing of value") (multiple-coin device, knock-off button, and, on at least 1 of the 2 machines, cash payoffs); *State v. Wassick,* 156 W.Va. 128, 191 S.E.2d 283 (1972) ("things of value") (multiple-coin device, tilt mechanism, knock-off button, knock-off meter, and cash payoffs). The New Jersey court in *Rosenkranz v. Vassallo,* 193 N.J.Super. 319, 473 A.2d 991 (1984), involving video poker, blackjack and similar devices which awarded free games, concluded that these machines were gambling devices because of various gambling-type mechanisms attached to the devices. The Pennsylvania court, in consolidated cases reported as *Com. v. Two Electronic Poker Game Machines,* 502 Pa. 186, 465 A.2d 973 (1983), found a machine to be a gambling device *per se,* citing the knock-off button, knock-off meter, holdover of scores in successive games, short playing time, and

dip switch to vary game credits. The court further held that another machine was not a gambling device *per se* where it contained neither a knock-off switch nor meter. In *Thole v. Westfall*, 682 S.W.2d 33 (Mo.App.1984), the court held a free-play device that registered 9,999 games and had a knock-off button and meter to be a gambling device *per se* because, under those circumstances, the free plays constituted "something of value" under the state gambling statute.

Other cases have reached different results under a variety of statutory provisions. In *People v. One Mechanical Device*, 11 Ill.2d 151, 142 N.E.2d 98, 100 (1957), the court declared that a free play awarded by a device constituted "neither money, the equivalent of money, nor a valuable thing" within the contemplation of that state's gambling laws. *State v. One "Jack and Jill" Pinball Machine*, 224 S.W.2d 854 (Mo.App.1949) held that a free play was not "property." This interpretation was codified under an amended statute that prohibited reward of "something of value," including replays, but excepted "an immediate right of replay not exchangeable for something of value." *Matter of: An Omega Brand: Double Up, Etc.*, 676 S.W.2d 292, 294 (Mo.App.1984). Other cases that have held that free plays are not sufficient rewards include *Tanner v. Sherman*, 67 Cal.App.2d 586, 154 P.2d 906 (1945), citing *Gayer v. Whelan*, 59 Cal.App.2d 255, 138 P.2d 763 (1943) ("merchandise, money, representative or articles of value, checks, or tokens redeemable in, or exchangeable for money or any other thing of value"); *State v. Durst*, 235 Kan. 62, 678 P.2d 1126 (1984); *Games Management Inc. v. Owens*, 233 Kan. 444, 662 P.2d 260 (1983) ("something of value"); *State v. One Bally Coney Island No. 21011 Gaming Table*, 174 Kan. 757, 258 P.2d 225 (1953) ("property"); *McNeice v. City of Minneapolis*, 250 Minn. 142, 84 N.W.2d 232 (1957) ("gambling device"); *Washington Coin Machine Ass'n v.*

*Callahan,* 79 U.S.App.D.C. 41, 142 F.2d 97 (1944) ("proper-ty").[11]

## VII

█ The cases from other jurisdictions, relied upon by the parties in support of their respective positions, although instructive, are certainly not dispositive in ascertaining the intended reach of the key phrase in § 264B "the user may receive or become entitled to receive any piece of money, coin, token or other object representative of [or] convertible into money."[12] Considering the history underlying the enactment of § 264B, the precise words used in the statute, the Maryland case law antecedent and subsequent to the statute's adoption, and the existing statutes enacted by the General Assembly authorizing licensure of amusement devices in designated jurisdictions, we think the registration of a free play upon a machine adapted as a gambling device, without more, is an "object" within the ambit of § 264B which is representative of or convertible into money.

To so construe § 264B is consistent with the statutes codified under the subtitle "Pinball Machines and Console Machines," Art. 56, §§ 18–20C. Sections 18, 19 and 20A, for example, provide for licensing of "free-play pinball

---

**11.** In several of these cases, the court declared that the gambling statutes, being criminal, required a strict construction.

**12.** Under the rule of *ejusdem generis,* where general words in a statute of uncertain meaning follow the designation of particular things or classes of subjects, the general words will usually be construed to include only those things of the same class or general nature as those specifically antecedently mentioned. The rule is based on the supposition that if the legislature had intended the general words to be construed in an unrestricted sense, it would not have enumerated the specific things. *See State v. Sinclair & Sinwellan Corp.,* 274 Md. 646, 658, 337 A.2d 703 (1975); *Smith v. Higinbothom,* 187 Md. 115, 130, 48 A.2d 754, 761 (1946). Application of the rule is influenced by the remedial nature of the statute. *See Culotta v. Raimondi,* 251 Md. 384, 387, 247 A.2d 519, 521 (1968). As Art. 27, § 246 requires that we give liberal interpretation to § 264B, we are of the view that the words "other object" in the statute are not restricted to tangible things, such as money, coin or a token, but may include the registration of a free game upon a gambling device.

machines" and "free-play console machines" in Baltimore City and nine counties, such devices being defined in these sections as follows:

"[A] 'free-play pinball machine' is defined as a machine which, upon the insertion of one or more coins, causes the mechanism to release one or more balls for the use of the player, to be propelled by means of a plunger.

"Upon the obtaining of certain scores or combinations of numbers, the machine rewards the player with a specified number of free games, allowing the player to continue to play the machine without the insertion of additional coins or tokens. The free-play pinball machine shall not pay out either cash or tokens.... [A] 'free-play console machine' is defined as a machine, the mechanism of which is encased in a wooden or metal cabinet, with a backboard upon which are certain combinations of numbers or symbols which the player must match. The insertion of one or more coins or tokens by the player releases the mechanism and causes two or more reels to spin. If the reels stop on specified combinations, matching those on the backboards, the machine awards the player with a specified number of free games, allowing the player to continue to play the machine without the insertion of additional coins or tokens. The free-play console machine shall not pay out either cash or tokens."

Sections 18(3) and 19(3) provide that the maintenance, possession and operation of such licensed devices "and the awarding of free games to players of said machines ... are hereby declared to be lawful." Section 19(5), as amended by ch. 741 of the Acts of 1963 (the same legislative session at which § 264B was enacted), provides that in Montgomery County only free-play pinball machines and not free-play console devices may be licensed. That section further provides, also by a 1963 amendment (ch. 590 of the Acts of 1963), that free-play console machines and free-play pinball machines, as earlier described in the section, could not be kept, maintained, operated, or licensed in Wicomico County, except that

"[p]inball machines which are identified only as amusement devices and do not come within the definition of a 'free-play console machine' or of a 'free-play pinball machine,' and which are not treated and considered as gaming devices under the Internal Revenue Act of the United States (Title 26, U.S.C.A., Chapter 36, § 4461, as amended or supplemented from time to time) may be licensed under and according to the provisions of this subtitle, and kept, maintained, and operated." [13]

Section 20B, enacted after the adoption of § 264B, authorized licensure of coin-operated amusement devices in Garrett County, including pinball and console machines, "the result of whose operation depends in whole or in part, upon the skill of the operator, whether or not [the device] affords an award to a successful operator." Section 20C, enacted by ch. 420 of the Acts of 1984, authorizes licensure of a wide range of coin-operated "amusement devices" in Washington County, including video games, pinball machines and similar devices. Manifestly, none of these licensing provisions authorize the use of the permitted devices for gambling purposes. As we see it, the licensing provisions, as presently contained in the 1983 Replacement Volume of the Code and its 1985 Cumulative Supplement, are all presently in effect. *See* Code (1984 Repl.Vol.), § 10–201 of the Courts and Judicial Proceedings Article declaring that a code replacement volume, together with any pocket supplements, constitutes evidence of the existing law of Maryland.[14]

---

13. The rationale of this enactment appears clear from its uncodified preamble which recites that the police and other authorities in Wicomico County found it almost impossible to obtain evidence of "payoffs" for free games registered on pinball or console devices. As a consequence, it would appear that Wicomico County may only permit licensure of non-free-play pinball and console machines and other like non-free-play amusement devices.

14. Also passed at the same 1963 legislative session at which § 264B was enacted was ch. 604 of the Acts of 1963, adding a new § 699B to the Public Local Laws of Prince George's County. That act made it unlawful to keep, maintain, possess, or operate any device or machine "for which payment of the federal tax specified in Sections 4461(A)(2)

■ We think the licensing provisions for amusement devices must be read *in pari materia* with § 264B and that a true amusement device which awards only free plays is not within the prohibition of § 264B unless the device itself is adapted for gambling. Therefore, a free game awarded upon a device which is not adapted for gambling, *i.e.*, a *true* free-play machine, is not an object representative of or convertible into money in the sense contemplated by § 264B. We thus find no merit in the State's contention that under § 264B a free play of itself, registered upon a device the operation of which involves the element of chance, is an object representative of or convertible into money because it is the "functional equivalent" of the coin or token otherwise necessary to activate the machine.

These conclusions are amply supported by § 264B's legislative history. By eschewing adoption of the Florida and New York statutory schemes, *see Chesapeake Beach, supra*, 251 Md. at 666, 248 A.2d 479, the Maryland legislature intended that devices which were not adapted for gambling, but which awarded automatic replays and nothing else, were not within the statutory definition of a slot machine. In adopting the rationale of the federal statutes, the legislature manifestly intended that a free-play device, equipped with gambling features such as odds mechanisms, a meter for recording the number of free plays released, or other recognized indicia of a gambling device, was a machine adapted for gambling. Consequently, it intended that free games registered upon such a gambling device, without more, would constitute an object representative of or convertible into money and that all such devices were prohibited slot machines under § 264B.

A prime focus of the Federal Gambling Devices Act of 1962 was upon pinball machines and the extent to which those devices were then being used for gambling purposes. Cognizant of this fact, the legislature by uncodified § 2 of

and 4462(A)(2) of the United States Internal Revenue Code of 1954 as amended is required."

§ 264B made special provision to insure that the device "commonly known or colloquially referred to, as 'pinball machine'" would not be deemed a prohibited slot machine as long as it did not permit any reward to a successful player "beyond an automatic replay of a game or games mechanically provided upon said machine." While the exclusionary provision is directed only to true free-play pinball machines, and does not encompass all free-play devices, that alone does not mean that other free-play devices, not adapted for gambling, and which award only free games, are slot machines under the statutory definition.[15] Dicta in *Chesapeake Beach* focusing on the import and effect of uncodified § 2 upon the definition of a slot machine does not require a different result.

## VIII

Property that is inherently illegal to possess is contraband *per se* and subject to summary seizure without proceedings for forfeiture. *Director of Fin., Pr. Geo's Co. v. Cole*, 296 Md. 607, 619, 465 A.2d 450 (1983). As slot machines are illegal to possess under § 264B, they are manifestly contraband *per se*. *See Soper v. Michal*, 123 Md. 542, 91 A. 684 (1914); *Police Commr's v. Wagner*, 93

---

**15.** Webster's Third New International Dictionary 1717 (unabr. ed. 1961) defines a "pinball machine" as "an amusement device often used for gambling that consists of a glass-topped cabinet in which a ball propelled by a plunger rolls down a slanting surface among an arrangement of pins and targets with each contact between ball and target scoring a number of points indicated by a system of electric lights." A similar description of a pinball machine appears in *Hoke v. Lawson*, 175 Md. 246, 1 A.2d 77 (1938). Like definitions are found in §§ 18, 19 and 20A of Art. 56 (distinguishing such devices from console machines) and throughout the literature describing various gaming devices. *See, e.g.*, Drzazga, *Gambling and the Law—Slot Machines*, 43 Journal of Criminal Law, Criminology and Police Science 114, 116–17 (1952); Bilek and Ganz, *The Pinball Problem—Alternative Solutions*, 56 Journal of Criminal Law, Criminology and Police Science 432 (1965); Comment, *Gambling Today via the "Free Replay" Pinball Machine*, 42 Marquette Law Review 98, 100 (1958); Note, *Pinball Machines Which Award Free Games as Gambling Devices*, 11 Wyoming Law Journal 163, 164 (1957).

Md. 182, 183, 48 A. 455 (1901). The principle is applicable to such devices that are merely stored in a warehouse. *See, e.g., Stanley-Thompson Liquor Co. v. People,* 63 Colo. 456, 168 P. 750 (1917); *Sterling Novelty Co. v. Commonwealth,* 271 S.W.2d 366 (Ky.1954); *State v. Madere,* 352 So.2d 666 (La.1977).[16] Indeed, Willow concedes that a free-play machine equipped with gambling features would be contraband *per se* if, as we have now determined, a free play recorded on such a gambling device is representative of or convertible into money.

■ The "antique" slot machines seized in this case appear to have been of the conventional "one-arm" bandit variety, with a coin chute to facilitate direct monetary payment. Clearly, these devices were contraband *per se* if not excepted from seizure under the provisions of § 264B(V) for devices manufactured prior to 1941, as held by the Court of Special Appeals. Section 264B(V) did not, however, become effective until July 1, 1981, six months after Willow's antique slot machines were seized by the police. Accordingly, at the time of their seizure, they were inherently illegal to possess, were contraband *per se* and thus subject to immediate seizure without further proceedings. That the State filed a forfeiture petition after the effective date of § 264B(V), although not required to do so, does not alter the fact that the State's interest in the devices vested immediately upon seizure. Moreover, under the provisions of Code (1981 Repl.Vol.), Article 1, § 3, the 1981 amendment of § 264B did not affect the legality of the

---

**16.** Other cases reaching the same result are *Bell v. State,* 212 Ark. 337, 205 S.W.2d 714 (1947) (seven slot machines); *Approximately Fifty-nine Gambling Devices v. People,* 110 Col. 82, 130 P.2d 920 (1942) (pinball machines); *Davis v. State,* 77 Ga.App. 541, 49 S.E.2d 173 (1948) (forty-six slot machines); *City of Chicago v. Sayer,* 330 Ill.App. 181, 70 N.E.2d 870 (1947) (118 "slot machines," some crated); *City of Wichita v. Stevens,* 167 Kan. 408, 207 P.2d 386 (1949) (punchboards); *Clark v. Holden,* 191 Miss. 7, 2 So.2d 570 (1941) (slot machines and payout tables); *State v. Appley,* 207 S.C. 284, 35 S.E.2d 835 (1945); *State v. Branney,* 62 Wyo. 40, 160 P.2d 972 (1945) (twenty-five lever slot machines).

forfeiture in this case, which was completed as of December 30, 1980.[17]

## IX

■ The Court of Special Appeals found certain of the devices to be inoperable and therefore not within the statutory definition of a slot machine. It relied upon its earlier holding in *Allen v. State*, 18 Md.App. 459, 307 A.2d 493 (1973) that devices which are only adaptable, but not actually adapted for use as slot machines, are not within the prohibition of § 264B. The court pointedly indicated in *Allen* that if the legislature intended a broader definitional sweep so as to encompass inoperable devices, it could change the law to prohibit those devices which are merely adaptable for such use. In the present case, the intermediate appellate court noted that over ten years had elapsed since *Allen* was decided and the legislature has not altered the definition of a slot machine under § 264B to include inoperable devices. 59 Md.App. at 61, 474 A.2d 545.

The devices in *Allen* consisted of an empty slot machine case, a reel mechanism for a slot machine, and a one-arm, console-type slot machine from which various parts necessary for it to operate had been removed. The court con-

---

**17.** Section 3 provides:

"The repeal, or the repeal and reenactment, or the revision, amendment or consolidation of any statute, or of any section or part of a section of any statute, civil or criminal, shall not have the effect to release, extinguish, alter, modify or change, in whole or in part, any penalty, forfeiture or liability, either civil or criminal, which shall have been incurred under such statute, section or part thereof, unless the repealing, repealing and reenacting, revising, amending or consolidating act shall expressly so provide; and such statute, section or part thereof, so repealed, repealed and reenacted, revised, amended or consolidated, shall be treated and held as still remaining in force for the purpose of sustaining any and all proper actions, suits, proceedings or prosecutions, civil or criminal, for the enforcement of such penalty, forfeiture or liability, as well as for the purpose of sustaining any judgment, decree or order which can or may be rendered, entered or made in such actions, suits, proceedings or prosecutions imposing, inflicting or declaring such penalty, forfeiture or liability."

cluded that the words in § 264B, "is adapted" for use, meant that the statute "covers only devices which *are* fit, or adjusted, for use as slot machines." 18 Md.App. at 465, 307 A.2d 493 (emphasis in original). While the inoperable devices in the present case were not as clearly described as in *Allen*, it does not appear that their inoperability was calculated or contrived as an expedient for avoiding the prohibition of § 264B against the possession of slot machines. In view of the legislature's silence in the years following the *Allen* decision, we conclude that the inoperable devices in this case were not subject to seizure.

### Conclusion

We hold that all of the seized coin-activated, free-play devices in Willow's possession, which involved an element of chance and which were equipped with odds mechanisms, or a meter for recording the number of free plays released, or other established indicia of a gambling device, are illegal slot machines under § 264B and subject to forfeiture as contraband *per se*. On the other hand, those free-play devices in Willow's possession, not adapted for gambling, which award automatic replays only, and which contain nothing more than a knock-off switch, are not slot machines under the statutory definition. Other of Willow's devices in question which award a successful player, directly or indirectly with money or merchandise, including the so-called antique slot machines, are clearly forfeitable as contraband *per se* under the statute. Devices otherwise within the statutory definition, but which are inoperable, are not slot machines where, as in *Allen* and as here, there is no indication that the devices were rendered inoperable solely to avoid seizure for violation of § 264B.[18]

In distinguishing between the various devices involved in this case, we have given due regard to the provisions of

---

18. We have considered but find no merit in Willow's contention that the issues concerning the antique and inoperable devices were not included in the State's petition for certiorari.

§ 264 of Art. 27 which require that we construe statutes "relating to gambling and betting liberally, so as to prevent the mischiefs intended to be provided against." *See Chesapeake Beach, supra,* 251 Md. at 662, 248 A.2d 479.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE MATTER TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. EACH PARTY TO PAY OWN COSTS.